# 2001 DTA 113

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL V DE PONCE Y AIBONITO

DIRECTV
Recurrente

v.

LUIS A. CARABALLO; DEPARTAMENTO DE ASUNTOS DEL COMSUMIDOR
Recurrido

Núm. KLRA-00-00887

San Juan, Puerto Rico, a 6 de febrero de 2001

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Ortiz Carrión y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA RESOLUCION

La recurrente, DIRECTV, nos solicita la revisión de una Resolución emitida por el Departamento de Asuntos del Consumidor, en adelante, D.A.C.O., el 31 de octubre de 2000 y archivada en autos en la misma fecha. Mediante dicho dictamen, la agencia ordenó a DIRECTV a pagarle a Luis A. Caraballo, en adelante, señor Caraballo, la suma de $951.07, así como corregir ciertos formularios de la recurrente para que cumplieran con lo dispuesto por el Reglamento de Anuncios Engañosos del D.A.C.O.

Por los fundamentos que expondremos a continuación, denegamos la expedición del auto.

### I

Surge de la Resolución que el 19 de julio de 2000, el señor Caraballo presentó una querella ante el D.A.C. O. En la misma alegó que para el 19 de mayo de 2000 compró un sistema de satélite a DIRECTV por el precio de $288.99. Como parte del contrato de compraventa, él entregó su equipo de antena *"Sky Vista"*, valorado en $548.00 a DIRECTV. █

Posteriormente, insatisfecho con el servicio, el señor Caraballo canceló su contrato con DIRECTV, solicitando la devolución de su dinero y del equipo *"Sky Vista"* que él había entregado.

Por su parte, DIRECTV se negó a devolver el dinero por entender que tenía derecho a retener los costos de instalación. Con respecto al equipo entregado, la recurrente se negó de igual forma a devolverlo, toda vez que el señor Caraballo había suscrito un documento denominado *"Rider para Sistema Sky Vista"* en donde se establecía que el equipo entregado por él no sería devuelto pasando el mismo a ser propiedad de DIRECTV. Asimismo, dicho documento establecía que el señor Caraballo se comprometía a un año de programación, y de no cumplirse con lo antes expuesto, tendría una penalidad de $100.00.

Así las cosas, el 27 de octubre de 2000, el D.A.C.O. celebró una vista administrativa. Luego de presentada la prueba por las partes, determinó en su Resolución de 31 de octubre de 2000, notificada y archivada ese mismo día, que el contrato de compraventa en los anejos de oferta establecía que si el querellante no estaba conforme con el servicio podía solicitar la cancelación del mismo dentro de los primeros sesenta (60) días y su dinero le sería devuelto. Asimismo, el D.A.C.O. determinó que en la hoja de oferta también se disponía que DIRECTV, en caso de cancelación, retendría el costo de instalación. Sin embargo, la prueba presentada, según resuelto, demostró que del contrato firmado por las partes no se desprendía costo alguno por servicio de instalación. Un análisis de dicho contrato reflejó que el señor Caraballo pagó la cantidad de $43.99 por una programación de nombre *"Direct Gold-2"*, $179.00 por un renglón llamado *"Product Package"* y $39.00 por un *"mirror-r"*. Estos tres renglones, al sumarlos, ascendían a $261.99, existiendo una diferencia de $17.00 cobrada por DIRECTV. Esta cantidad no aparecía en el contrato, desconociéndose el concepto por el cual se cobró. DIRECTV reclamó que la cantidad de $120.00 por costo de instalación estaba incluido en el renglón conocido como *"Product Package"*.

De igual forma, en su Resolución, el D.A.C.O. determinó que el señor Caraballo solicitó la cancelación del contrato, previo al término de sesenta (60) días establecido y luego de haber pagado dos (2) mensualidades por la cantidad de $114.08, por no estar conforme con el servicio.

En dicha Resolución dictaminó, además, D.A.C.O., que los anuncios de DIRECTV constituian un anuncio engañoso que violaba las disposiciones de las Secciones 250.403, 250.405 y 250.406 del Reglamento de Anuncios Engañosos. En dichos anuncios, el beneficio de cancelación es prácticamente inexistente para el consumidor, pues de una inversión de $951.07 pierde $768.00 que se quedan en manos de DIRECTV.

A tales efectos, ordenó a DIRECTV corregir su formulario de contrato a fin de que se estableciera, de manera meridiana, el costo de la instalación. También ordenó corregir el formulario de oferta, de manera que

**104**

estuviera en concordancia con las disposiciones del Reglamento de Anuncios Engañosos; así como enmendar el documento de entrega del equipo "*Sky Vista*", de manera que reflejara claramente qué ocurrirá con el equipo en caso de cancelación del contrato por parte del consumidor.

Inconforme con dicha determinación, DIRECTV presentó el 21 de noviembre de 2000 una "*Moción de Reconsideración*". El 27 de noviembre de 2000, notificada por correo el 28 de noviembre de 2000, el D.A.C.O. emitió Resolución en donde dictaminó que la "*Moción de Reconsideración*" presentada por DIRECTV se presentó luego de haber transcurrido el término de veinte (20) días que concede la Sección 250.28 del Reglamento de Adjudicaciones del D.A.C.O.

Insatisfecha, DIRECTV recurre ante nos.

## II

En su escrito, DIRECTV nos plantea que incidió el D.A.C.O. al concluir arbitraria, caprichosa, irrazonable y contraria a derecho que la "*Moción de Reconsideración*" se presentó fuera del término y, por tanto, no tenía jurisdicción para atenderla. Asimismo, planteó que erró el D.A.C.O. al dejar sin efecto el contrato suscrito entre las partes libre y voluntariamente, de manera arbitraria, caprichosa, irrazonable y contraria a derecho.

En relación a su primer planteamiento, le asiste la razón al recurrente. El término de veinte (20) días que tenía el recurrente venció el 20 de noviembre de 2000, el cual era un día de fiesta legal, por lo que el plazo se extendió hasta el 21 de noviembre de 2000. La Regla 68.1 de las de Procedimiento Civil., 32 L.P.R.A. Ap. III, R. 68.1, dispone que el último día del término se incluirá, siempre que no sea sábado, domingo, ni día de fiesta legal, extendiéndose entonces el plazo hasta el fin del próximo día que no sea sábado, domingo, ni día de fiesta legal.

No obstante, a fin de subsanar dicho error, procederemos a atender el recurso sin mayor dilación, cumpliendo con nuestro derrotero de solución rápida, justa y económica de todo procedimiento.

Dicho lo anterior, pasemos a resolver según lo intimado.

## III

El inciso (j) del Art. 6 de la Ley Núm. 5 de 23 de abril de 1973, según enmendada, conocida como, "*Ley Orgánica del Departamento de Asuntos del Consumidor*", 3 L.P.R.A. §341e(j), faculta al Secretario de dicha agencia para "*reglamentar y fiscalizar los anuncios y las prácticas engañosas en el comercio...*". Esta facultad la ejerció el Secretario mediante la promulgación del Reglamento de Prácticas y Anuncios Engañosos del 3 de octubre de 1990, en adelante, el Reglamento, en el cual expresamente se prohíben las prácticas y los anuncios engañosos.

En su Art. 5 (D), Sec. 250.403 del Reglamento, se define anuncio engañoso como cualquier anuncio que constituya o tienda a constituir fraude, engaño o comunique o tienda a comunicar una idea falsa o incorrecta sobre lo anunciado. Más adelante, el inciso (L) establece que se considera práctica engañosa cualquier acto, práctica, curso de conducta, mecanismo de persuasión, ofrecimiento, información o promesa hecha, aparentemente hecha o sugerida, que fuere engañosa, falsa, fraudulenta o que de cualquier forma tienda al engaño, o mediante la cual se tergiversen o puedan malinterpretarse los verdaderos hechos de las cosas. *Id.*

Además, dicho Reglamento establece en el inciso B(1) del Art. 7, Sec. 250.405, que el término práctica engañosa incluye, entre otros, los siguientes: "*representar o expresar un hecho o una oferta si tal declaración es engañosa o falsa, o posee la tendencia o capacidad para confundir, o si no se tiene la información suficiente para sustentarla*". El inciso B(2) del anterior Art. 7 añade que se considerará práctica engañosa, también, inducir o tratar de inducir a una persona a actuar a cambio de cualquier beneficio que luego resulta ser menor, falso o inexistente.

Sobre la forma de los anuncios, el Reglamento en su Art. 8, Sec. 250.406, prescribe que deberá estar redactado de tal forma que lleve a la mente del consumidor toda aquella información que le sea esencial y necesaria para conocer sobre las cualidades, calidad, precio, tamaño, cantidad, utilización o cualquier otra característica del bien o servicio que se anuncia, libre de toda ambigüedad que pueda tender a confundirlo.

De otro lado, en Puerto Rico rige el principio de la libertad de contratación. *Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc.,* 128 D.P.R. 842, 850 (1991). Como parte de esta norma, "*los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público*". Art. 1207 del Código Civil, 31 L.P.R.A. § 3372.

Una vez establecidas las cláusulas y condiciones del acuerdo, se entenderá perfeccionado el contrato por el consentimiento entre las partes, y desde ese momento cada una de ellas vendrá obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. § 3375. Esa obligación de cumplir con lo pactado se funda en el principio de la buena fe, el cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta. *Puerto Rico, Inc. v. Ramallo Brothers, supra,* a la pág. 852, (citando a L. DIEZ-PICAZO, FUNDAMENTOS DE DERECHO CIVIL PATRIMONIAL, 2da ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, pág. 99).

Se presume que el consentimiento prestado por las partes, es válido. No obstante, el consentimiento será nulo si fue prestado por error, violencia, intimidación o dolo. Art. 1217 del Código Civil, 31 L.P.R.A. § 3404.

Como regla general, los contratos no requieren de interpretación cuando sus términos y condiciones son claros y no dan margen a ambigüedades o diferentes entendimientos, por lo que se estará al sentido literal de las mismas. Art. 1233 del Código Civil, 31 L.P.R.A. § 3471. No obstante, cuando el contrato contenga cláusulas oscuras o ambiguas, por necesidad se activa la norma de interpretación contractual. Ambigua es una cláusula cuyo lenguaje parece ser claro, pero admite que se le de interpretaciones conflictivas. *J.R.T. v. Junta Adm. del Muelle Municipal de Ponce,* 122 D.P.R. 318, 331 (1988). En tales casos, ello no deberá favorecer a la parte que hubiese ocasionado la oscuridad. Art. 1240 del Código Civil, 31 L.P.R.A. § 3478.

La mencionada norma de interpretación contractual aplica con mayor fuerza cuando se trata de contratos de adhesión. *Herrera v. First Nat'l. City Bank,* 103 D.P.R. 724, 727 (1975). Llamamos contrato de adhesión aquél en que una sola de las partes dictó las condiciones del acuerdo. *Zequeira v. C.R.U.V.,* 83 D.P.R. 878 (1961).

En nuestra jurisdicción, los contratos de adhesión son tratados de modo especial, pero ello no significa que éstos deban ser siempre interpretados liberalmente en favor de la parte más débil y mucho menos que tales pactos estén viciados de nulidad. *Arthur Young v. Vega III,* 136 D.P.R. 157, 166, n.9 (1994); *Casanova v. P.R. Amer. Ins. Co.,* 106 D.P.R. 689, 697 (1978). La mera desigualdad económica entre las partes no hace que el contrato sea uno de adhesión, ya que lo usual es que las partes contratantes no están en igual posición económica. *Consolidated v. Cooley,* 103 D.P.R. 6, 9 (1974). Por consiguiente, la adhesión tampoco implica o conlleva la nulidad del contrato. *Casanova v. P.R. Amer. Ins. Co., supra.*

En ausencia de ambigüedad u obscuridad, el contrato de adhesión debe ser atendido según sus términos. *Arthur Young v. Vega III., supra; Casanova v. P.R. American Ins. Co., supra.* Cuando los términos y condiciones del contrato de adhesión son claros, específicos y no dan margen a diferentes interpretaciones, así deben aplicarse. *García Curbelo v. A.F.F.,* 127 D.P.R. 747, 760 (1991).

## IV

De entrada, es menester recordar que la prohibición de prácticas y anuncios engañosos persigue evitar que el consumidor acuda a un comercio o perfeccione un contrato motivado por un engaño o error del comerciante. El objetivo principal de esta reglamentación, es proteger al consumidor, evitando que el comerciante obtenga beneficios de sus prácticas engañosas.

En el caso de autos, no nos queda la más mínima duda, a la luz del derecho y las regulaciones antes esbozadas, que estamos frente a un anuncio engañoso.

Por un lado, la propaganda de la recurrente garantiza que si el cliente no está totalmente satisfecho: *"...puede cancelar el servicio y su afiliación sin penalidad alguna"; "...sesenta (60) días de satisfacción total garantizada o su dinero le será devuelto"*. (Énfasis nuestro.) Véase Apéndice a la pág. 21.

Una disposición similar surge de la página número 22 del Apéndice del recurrente y que abona a lo anterior, lo siguiente:

*"DIRECTV ofrece sesenta (60) días de satisfacción total garantizada en compra del (los) sistema(s), o su dinero le será devuelto a vuelta de correo en un período no mayor de sesenta (60) días. En adicción, DIRECTV ofrece tres (3) años de garantía en la compra del (los) sistema(s). El costo por concepto de instalación no es reembolsable..."*. (Énfasis nuestro.)

De otro lado, en el Contrato de Instalación y Servicio de DIRECTV ▮ suscrito por el señor Caraballo no surge costo alguno por concepto de instalación, a pesar de que existe en dicho documento un apartado para así haberlo hecho, por lo que podemos colegir que el servicio de instalación era gratuito o estaba incluido como parte de la oferta.

Así, pues, de la lectura de los documentos anteriores surge con meridiana claridad que toda persona que contrate los servicios de DIRECTV y que insatisfecha con el mismo desee cancelarlo, viene obligado ha así hacerlo dentro de los primeros sesenta (60) días de su contrato. Es decir, si el señor Caraballo suscribió su contrato con el recurrente el 19 de mayo de 2000 tenía hasta el 18 de julio de 2000 para cancelar su contrato sin penalidad y con derecho a que se le reembolsara su dinero, excepto aquella suma que se cobrara por concepto de instalación. Por lo tanto, al señor Caraballo haber optado por lo anterior dentro de dicho plazo, o sea el 9 de julio de 2000, [3] tenía derecho a que se le reembolsara su dinero sin penalidad alguna, y como no se pactó, ni se le cobró cantidad alguna por la instalación, no se le podía descontar nada por ese concepto.

La controversia de autos se complica más aún, con el contrato titulado Rider para Sistema Sky Vista, en adelante Rider, que dispone:

*"Reconozco y acepto que hago entrega voluntaria del sistema Sky Vista. Una vez firmado este acuerdo, pasará a ser propiedad nuestra y DIRECTV TM podrá disponer del decodificador y el mismo no será devuelto. Entiendo que las opciones son: compra por $ 249.99 o alquiler por $19.99 más $9.99 por concepto de alquiler de equipo mensuales. Entiendo y acepto garantizar un (1) año de la programación que se especificó en el contrato para poder recibir el precio que aplica al garantizar Direct Platinum, Direct Gold 1 o Direct Gold 2. De no cumplir con lo antes expuesto, tendré una penalidad de $100.00. Entiendo y acepto que la programación se carga mensualmente y por adelantado a la cuenta que se especificó en el contrato, sea tarjeta de crédito o autodébito directo. Véase Apéndice a la página 29."*

Alega el recurrente que dicho documento no es parte del anuncio publicado, sino un contrato suscrito entre las partes, que el mismo es claro y libre de ambigüedades y que, contrario a lo resuelto por el D.A.C.O., específicamente dispone qué iba a pasar con el equipo. No podemos avalar tan inconsistente interpretación de los contratos, anuncios o propaganda y garantías aquí en controversia, los cuales deben ser interpretados complementariamente. Concurrimos con lo resuelto con el D.A.C.O., por cuanto un examen de la oferta del recurrente, unido a la cláusula antes reseñada en el contrato Rider, demuestra ser una engañosa y ambigua, pues admite interpretaciones conflictivas. *J.R.T. v. Jta. Adm. del Muelle Municipal de Ponce, supra.* Por lo tanto, tratándose de contratos de adhesión ambiguos, se deberá favorecer a la parte que no hubiese ocasionado la oscuridad. Art. 1240 del Código Civil, *supra.*

El recurrente pretende que este Tribunal considere el contrato Rider como distinto, independiente y ajeno a

toda propaganda, anuncios o garantías de satisfacción total que acompaña la publicidad de DIRECTV. No podemos refrendar dicha pretensión. Resolver como nos sugiere DIRECTV, le permitiría decidir *a posteriori* qué garantía va honrar y cuál no, sobre cualesquiera de sus productos y equipos. Veamos.

Unido con el contrato Rider (el mismo día en que fue suscrito) se le entregaron al señor Caballero todos los documentos o anuncios que establecen las garantías de satisfacción total, dándole así la impresión al recurrido que tenía derecho a todos los beneficios que en ellos se anunciaban. En el contrato Rider, a su vez, hace referencia al Contrato de Instalación y Servicios; en este último es donde se establece la programación a suscribirse y el tipo de prepago ha acogerse. Como podemos colegir, ambos contratos se complementan entre sí, por lo que si al Contrato de Instalación y Servicios le es de aplicación la garantía de satisfacción total, también lo es para el contrato Rider. Más aún, el anterior planteamiento resulta frívolo por cuanto el contrato Rider, al hacer referencia a las opciones, específicamente dice "*compra por $249.99*" y como este contrato nada dispone sobre la garantía de equipo comprado, se hace compulsorio, para suplir dicho vacío, acudir a la promesa de satisfacción total garantizada y a la garantía de DIRECTV, que es donde se dispone sobre ese particular.

Por último, nos queda por resolver en cuanto al pago de $951.07 que le impusiera D.A.C.O. a DIRECT Ciertamente, ante la eventualidad de que un cliente, que suscribiera un contrato Rider, cancelara su contrato de servicio dentro de los sesenta (60) días y de lo que nada se disponía en dicho contrato, la imposición de dicho pago nos merece total deferencia. Después de todo, no debemos olvidar que dicha agencia administrativa fue la que tuvo ante sí la prueba y la aquilató según la credibilidad que la misma le merecía.

Así, pues, la norma reiterada es que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo. *Asociación de Vecinos del Hospital San Jorge v. United Medical Corporation*, 150 D.P.R. __ (2000), **2000 J.T.S. 21**, a las págs. 560-61; *Domínguez Talavera v. Caguas Expressway Motors*, 148 D.P.R. __ (1999), **99 J.T.S. 85**, a las págs. 1,067-68; *T-JAC. Inc. (Wal-mart Caguas) v. Caguas Centrum Limited Partershin, S.E.,* 148 D.P.R. __ (1999), **99 J.T.S. 60**, a la pág. 884; *Associated Insurance Agencies, Inc. v. Comisionado de Seguros de Puerto Rico*, 144 D.P.R. __ (1997), **97 J.T.S. 142**, a la pág. 332.

La evidencia sustancial para sostener la actuación administrativa es aquella que una mente razonable puede aceptar como adecuada para sostener una conclusión. La intervención del Tribunal está limitada a evaluar si la decisión de la agencia es razonable y no si hizo una determinación correcta de los hechos ante su consideración. Si existe más de una interpretación razonable de los hechos, los tribunales sostendrán la decisión de la agencia y no sustituirán su criterio por el de ésta. Al revisar las determinaciones de hechos, la evidencia debe ser considerada en su totalidad. *Asociación de Vecinos del Hospital San Jorge v. United Medical Corporation*, **2000 J.T.S. 21,** a la pág. 561; *Associated Insurance Agencies, Inc. v. Comisionado de Seguros, supra*, a las págs. 332-333; *Hilton Hotels Internationals v. Junta de Salario Mínimo*, 74 D.P.R. 670, 687 (1953).

En el caso de autos, hemos examinado la decisión recurrida, a la luz de los argumentos planteados en el recurso, y no hallamos base para intervenir con la determinación impugnada. Un análisis del caso de marras, no revela que el D.A.C.O. haya actuado arbitraria o caprichosamente al emitir su determinación. Es la agencia quien tiene ante sí la prueba y los hechos para determinar de forma más razonable la controversia ante ellos. Este Tribunal no tiene elementos para intervenir con dicha determinación. Resaltamos, además, la importancia de que los tribunales guarden deferencia hacia las determinaciones de las agencias cuando éstas utilizan su experiencia y conocimiento en la materia que atienden a diario.

## V

Por los fundamentos esbozados, se deniega la expedición del auto solicitado.

Lo pronunció el Tribunal y lo certifica la señora Secretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

**ESCOLIOS 2001 DTA 113**

**1.** El valor se desglosa: a) Antena - $499.00, b) Codificador - $49.00.

**2.** Véase Apéndice a las páginas 23. La página 24 del Apéndice, a pesar de los esfuerzos de este Tribunal, resultó ilegible, por lo que se desconoce su contenido.

**3.** Véase Apéndice a la página 27.