# 2001 DTA 171

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL I**

MANLEY BERENSON REALTY & DEVELOPMENT PUERTO RICO, INC.
Demandante-Apelado

v.

CARLOS R. FLORES Y CATALINA SANZ H/N/C/ POSTAL ZONE
Demandados-Apelantes

ATLAS ROOFING, INC.
Terceros Demandados

Núm. KLAN-2000-00922

San Juan, Puerto Rico, a 22 de mayo de 2001

Panel integrado por su Presidenta, la Jueza Fiol Matta,
la Jueza Rodríguez de Oronoz y el Juez González Román

Fiol Matta, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Se solicita la revocación de una sentencia sumaria dictada por la Sala Superior de San Juan del Tribunal de Primera Instancia el 10 de junio de 2000 que desestima la reconvención en el caso de epígrafe. Por los fundamentos que discutimos a continuación, revocamos la sentencia recurrida y devolvemos el caso para su resolución en los méritos.

## I

El 20 de mayo de 1998, Vornado Montehiedra Acquisitions, L.P., empresa propietaria del centro comercial Montehiedra Town Center de San Juan, demandó en cobro de dinero,.incumplimiento de contrato, rescisión de contrato y daños y perjuicios a Carlos R. Flores y Catalina Sanz (en adelante, "*Flores y Sanz*"), en su carácter de propietarios del establecimiento comercial de nombre "*Postal Zone*". El 9 de julio de 1998, Flores y Sanz contestaron la demanda y reconvinieron, solicitando compensación de daños por vicios ocultos, incumplimiento de contrato, pérdidas materiales y angustias. El 21 de julio de 1998, la demanda fue enmendada a los efectos de sustituir el demandante por Manley Berenson Realty and Development, Inc. (en adelante, "*Manley*"). El 9 de octubre de 1998, Flores y Sanz sometieron una reconvención enmendada, a los efectos de solicitar una compensación mayor por concepto de daños. El 5 de marzo de 1999, Manley desistió voluntariamente de la demanda, lo cual fue aceptado por el tribunal mediante sentencia parcial final dictada en dicha fecha. El 17 de mayo de 1999, Manley entabló demanda de tercero contra Atlas Roofing, Inc. y la compañía aseguradora de nombre desconocido, denominada bajo las siglas "*ABC*" para propósitos del pleito.

El 14 de marzo de 2000, Manley solicitó al tribunal que dictara sentencia sumaria a su favor en cuanto a la reconvención, alegando que el contrato de arrendamiento vigente entre las partes tenía el efecto de privar a Flores y Sanz de una causa de acción. El 15 de marzo de 2000, Manley sometió una Moción informativa indicando que interesaba someter a la reconvencionista Sanz a un examen físico o mental practicado por la Dra. Haydée Costas, toda vez que la condición física o mental de la señora Sanz estaba en controversia. Flores y Sanz presentaron su oposición a la solicitud de sentencia sumaria el 10 de abril de 2000, alegando que Manley se había obligado a tomar medidas que hubieran evitado el daño y había incumplido dicha obligación y que las cláusulas del contrato no podían ser interpretadas para inmunizar a Manley contra las consecuencias de su incumplimiento. Incluyeron declaración jurada de Flores respecto a las filtraciones e inundaciones y sus consecuencias, así como a las notificaciones de Flores y Sanz a Manley y la negativa de éste a corregir los defectos señalados. Acompañaban también, como exhibit a la declaración jurada, los desgloses pormenorizados de las pérdidas alegadas.

El 10 de junio de 2000, el tribunal *a quo* dictó sentencia sumaria a favor de Manley, la cual fue notificada el 21 de julio de 2000. El 18 de agosto de 2000, Flores y Sanz presentaron la presente apelación. En la misma, plantearon la comisión por el tribunal de instancia de dos errores: (1) al dictar sentencia sumaria desestimando la reconvención, resolviendo que los arrendatarios Flores y Sanz asumieron el riesgo por las pérdidas ocurridas por filtraciones de agua, y (2) al dictar sentencia sumaria desestimando las reclamaciones en cuanto a las reclamaciones de daños por angustias mentales y ganancias dejadas de percibir por violación del contrato.

## II

En apoyo de su primer señalamiento de error, Flores y Sanz alegan, primeramente, que la solicitud de sentencia sumaria interpuesta por Manley no refutó los hechos alegados en la reconvención, por lo cual el Tribunal estaba impedido de conceder el remedio solicitado por Manley. Además, exponen que Manley obró de mala fe en la preparación y administración del contrato y que el tribunal de instancia permitió que el cumplimiento del contrato se dejara al arbitrio de una de las partes, al imputar a Flores y Sanz la asunción del riesgo, contribuyendo así a un abuso del derecho. Veamos.

No hay duda de que un tribunal puede disponer de un caso sin celebrar vista en su fondo mediante sentencia sumaria, si el promovente demuestra que no hay controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36; *PFZ Properties, Inc. v. General Accident Insurance Company*, 136 D.P.R. 881, 911 (1994); *Medina Morales v. Merck, Sharp & Dohme*, **94 J.T.S. 52**, Opinión de 7 de abril de 1994. No obstante, a pesar de que promueve la economía procesal, el objetivo de la sentencia sumaria, como el de toda acción judicial, es proveer una solución justa a la controversia entre las partes. *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272, 279 (1990). Es por ello que, antes de disponer de un caso sumariamente, el tribunal debe determinar que no existe controversia en cuanto a los hechos y, en segundo lugar, que en

derecho procede emitir sentencia a favor de la parte que la solicita. *M.J.C.A., Menor v. Menor*, 124 D.P.R. 910, 930 (1989).

En vista de que la sentencia sumaria adjudica el litigio sin que las partes tengan la oportunidad de presentar su caso en corte, la jurisprudencia la concibe como un *"remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad y ha demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones que no hayan sido refutadas por la evidencia presentada con la moción"*. *Corp. of Presiding Bishop v. Purcell*, 117 D.P.R. 714, 720 (1987). Sólo se puede dictar sentencia sumaria cuando no existe una legítima disputa de hecho a ser dirimida, y sólo resta aplicar el derecho, y no se ponen en peligro o se lesionan los intereses de las partes. *Pardo Santos v. Stella Royo*, **98 J.T.S. 80** (Res. el 17 de junio de 1998). Los hechos aportados por la parte contra la cual se solicita la sentencia sumaria deben ser tomados por ciertos. *Roth v. Lugo*, 87 D.P.R. 386, 398 (1963). Por eso, la duda por parte del tribunal sobre la existencia de una controversia de hechos en el caso ante su consideración derrota la moción de sentencia sumaria. Más aún, según nuestro ordenamiento, toda duda en cuanto a si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción.

La controversia que nos ocupa trata de un contrato de arrendamiento que suscribieron el 13 de junio de 1996 Big Beaver of Río Piedras Development Corporation, una subsidiaria de K-Mart Corp. y Flores y Sanz, sobre un local comercial de 1,080 pies cuadrados por un término de ocho años. El mismo consiste de treinta y ocho (38) artículos y tres anejos. El artículo X versa sobre mantenimiento, indemnización y seguro, mientras el artículo XXI se refiere al incumplimiento de sus obligaciones por el arrendador.

Desde el 5 de julio de 1996, el techo del local arrendado evidenció filtraciones de agua. El 23 de noviembre de 1996, Flores y Sanz informaron por escrito a Manley sobre el problema, en ocasión de una caída sufrida por un cliente frente a la tienda. El 21 de mayo de 1997, las partes se reunieron para discutir una inundación ocurrida a causa de una avería en un tubo de desagüe; ésta era la tercera vez que se inundaba el local. Las partes se volvieron a reunir el 22 de agosto de 1997 para discutir el asunto, tras lo cual Flores y Sanz escribieron a Manley una carta ratificando la información. Las comunicaciones al respecto, fechadas los días 24 de mayo de 1997, el 23 de agosto de 1997, el 1 de octubre de 1997 y el 5 de febrero de 1998 no ocasionaron que el problema fuera remediado.

El 20 de mayo de 1998, se presentó la demanda que dio inicio a este procedimiento, de la cual se desistió voluntariamente en marzo de 1999. ▄ Mientras tanto, el 21 de septiembre de 1998, una inundación en el local resultó en la alegada pérdida total de la operación comercial. Por esa razón, Flores y Sanz resolvieron el contrato el 1 de octubre de 1998 y entregaron la posesión y las llaves del local al gerente, Richard Axtmeyer. La reconvención que nos ocupa, resultado de la situación descrita, se fundamentó en la sección 10.1 del contrato, la cual lee como sigue:

*"Lessor shall keep and maintain the roof over the Demised Premises and structural portions of the Demised Premises in repair, provided that Lessee shall give Lessor prior notice of the necessity for such repairs and further provided that any damage thereto shall not have been caused by any act or negligence of Lessee, its employees, agents, invitees, subtenants, licensees, assignees or contractors, in which event such damage shall be repaired by Lessor at Lessee's sole cost and expense. Other than as herein provided, Lessor shall not be responsible to maintain or make any improvements or repairs of any kind in or upon the Demised premises."*

En su reconvención, Flores y Sanz imputaron a Manley haberle entregado un local con vicios ocultos y negarse a efectuar las reparaciones y compensación necesarias, a pesar de que Flores y Sanz habían cumplido con su deber de notificar los daños y solicitar su reparación y de que había transcurrido un período de tiempo razonable. Manley respondió que toda reclamación económica debió haberse dirigido a la empresa aseguradora y solicitó se dictara sentencia sumaria alegando que de acuerdo al contrato, estaba relevado de toda responsabilidad frente a Flores y Sanz.

El tribunal de instancia basó su determinación de dictar sentencia sumaria a favor de Manley en cuatro cláusulas del contrato de arrendamiento que, según entendió, eran claras y sólo requerían ser interpretadas. Además, indicó que los términos y condiciones de dichas cláusulas incidían sobre uno de los elementos esenciales de las causas de acción de los reconvencionistas. Estableció, de entrada, que no existía controversia real sobre los hechos materiales, por lo cual era innecesario continuar el pleito.

Las cláusulas contractuales que sirvieron de base a la determinación del tribunal están contenidas en los incisos (a), (b) y (d) de la sección 10.3, así como la sección 10.5 del contrato, los cuales forman parte del artículo X del mismo. Este artículo se intitula *"Maintenance of Demised Premises, Indemnification and Insurance"*. Las disposiciones de referencia leen como sigue:

*"Section 10.3. (a) Lessee shall protect, defend, indemnify, save and hold harmless Lessor, Managing Agent and/or any fee owner or ground or underlying lessors of Lessor's Parcel, or of the Shopping Center, and Lessor's mortgagee, if any, against and from any and all claims, demands, fines, suits, actions, proceedings, order, decrees and judgments of any kind or nature by, or in favor of; anyone whomsoever, and against and from any and all costs, damages and expenses, including attorney's fees, resulting from, or in connection with loss of life, bodily or personal injury or property damage arising, directly or indirectly, out of, or from, or on account of, any accident or other occurrence in, upon, at or from the demised premises, or occasioned in whole or in part through the use and occupancy of the Demised Premises or any improvements therein or appurtenances thereto, or by any act or omission of Lessee or any subtenant, concessionaire or licensee of Lessee, or their respective employees, agents, contractor or invitees in, upon, at or from the Demised Premises or its appurtenances or any Common Area (as defined in Article XXX hereof) of the Shopping Center.*

*(b) Lessee, and all those claiming by, through and under Lessee, shall store their property in and shall occupy and use the Demised Premises and any improvements therein and appurtenances thereto, and all other portions of the Shopping Center, solely at their own risk, and Lessee, and all those claiming by, through and under Lessee, hereby release Lessor and Managing Agent, to the full extent permitted by law, from all claims of every kind, including loss of life, personal or bodily injury, damage to merchandise or equipment, fixture or other property, or damage to business or for business interruption, arising, directly or indirectly, out of, or from, or on account of, such occupancy and use, or resulting from any present or future condition or state of repair thereof.*

*(c) ...*

*(d) Neither Lessor nor Managing Agent shall be responsible or liable at any time for any defects latent or otherwise, in any buildings or improvements in the Shopping Center or any of the equipment, machinery, utilities, appliances or apparatus therein nor shall Lessor be responsible or liable at any time for loss of life, or injury or damage to any person or to any property or business of Lessee, or those claiming by, through or under Lessee, caused by, or resulting from, the bursting, breaking, leaking, running, seeping, overflowing or backing up of water, steam, gas or sewage, in any part of the Demised Premises or caused by, or resulting from, acts of God or the elements or resulting from any defect or negligence in the occupancy, construction, operation or use of any buildings or improvements in the Shopping Center, including the Demised Premises or any of the equipment, fixtures, machinery, appliances or apparatus therein.*

*Section 10.5. Lessee shall procure and continue in force from and after the date Lessor shall deliver possession of the demised Premises to Lessee and throughout the term of this Lease (a) Comprehensive general liability insurance and insurance for damage to property in the Demised premises, including water damage and sprinkler leakage and legal liability arising out of any one occurrence, with a combined single limit of Two Million and 00/100 Dollars ($2,000,000.00); ...".*

A base de estas disposiciones y su análisis a la luz de la doctrina general del contrato, ▪ el tribunal *a quo* concluyó que Flores y Sanz carecían de causa de acción contra Manley, ya que los primeros habían asumido la

responsabilidad de cualquier daño que surgiera como resultado de inundaciones, sin importar su origen y naturaleza, y había relevado a Manley de responsabilidad. La responsabilidad`de Flores y Sanz quedaba protegida, según indicó el tribunal, *"mediante la suscripción de una póliza de seguro que cubriera el tipo de evento por el cual se reclama"*. Resolvió que, en conjunto, las cláusulas transcritas progresivamente iban especificando y precisando el tipo de circunstancias sobre las cuales se liberaba de responsabilidad al arrendador y sus agentes. Así, concluyó que al aceptar los términos y condiciones del contrato, Flores y Sanz asumieron los riesgos que entrañaba el hacer negocios y que eran anticipados en la etapa de la formación del contrato, incluyendo la circunstancia específica por la cual se reclamaba en la reconvención presentada en el caso de epígrafe. La única responsabilidad del arrendador era, pues, reparar y mantener el techo a su costo, previa notificación del arrendatario.

Entendió el tribunal *a quo* que estas disposiciones limitaban el alcance de la sección 10.1, que servía de base a la reconvención y que hemos transcrito antes. Debido a ello, concluyó que esta sección servía sólo para *"designar al arrendador como aquel [sic] encargado de mantener y reparar el techo"*, lo cual no conllevaba *"que el arrendador se responsabiliza por los daños causados por inundaciones y problemas que el techo pudiera tener, ni por los hechos alegados en la reconvención enmendada"*. Entendió, además, que las condiciones del contrato de arrendamiento no eran revisables y que Flores y Sanz no habían establecido los requisitos para considerar que el contrato era uno de adhesión.

Para la correcta disposición del recurso, debemos determinar, primeramente, si la reconvención podía resolverse acorde al contrato sin la necesidad de vista evidenciaria.

### III

El Código Civil de Puerto Rico define el contrato de arrendamiento en términos de las partes que lo suscriben: en el caso del arrendamiento de cosas, el arrendador es el que *"se obliga a ceder el uso de la cosa"* y el arrendatario es el que *"adquiere el uso de la cosa"*. Art. 1436 del Código Civil de 1930, 31 L.P.R.A. sec. 4031. El Art. 1443 de dicho cuerpo legal establece *"la obligación [del arrendador] de sanear los vicios o defectos ocultos que tuviere"* la cosa arrendada, por referencia al contrato de compraventa. *Ferrer Delgado v. G. M.C.*, 100 D.P.R. 246 (1971). El Art. 1444, a su vez, establece la obligación de practicar en una finca urbana arrendada *"todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada"*. 31 L.P.R.A. sec. 4051(2). Por tanto, el arrendador, constituido como tal en virtud de un contrato de arrendamiento, garantiza la entrega y el mantenimiento del bien arrendado en un estado apropiado para su uso. En esto, está apoyado por ciertas presunciones que el arrendatario debe derrotar para establecer una causa de acción por vicios ocultos o por falta de reparación; a saber, la presunción de que el bien fue entregado al arrendatario en buen estado y de que el deterioro del bien arrendado es responsabilidad del arrendatario. Arts. 1452, 1453 y 1454 del Código Civil, 31 L.P.R.A. secs. 4059, 4060 y 4061; Regla 14 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 14; Véase Manresa, *Comentarios al Código Civil*, Tomo X, Vol. II, Madrid, 1969, pág. 160.

El Artículo 1446 del Código establece el remedio disponible en caso de infracción de la responsabilidad de reparar el bien arrendado, al conceder al arrendatario el derecho a *"pedir la rescisión del contrato y la indemnización de daños y perjuicios, o sólo esto último, dejando el contrato subsistente"*. 31 L.P.R.A. sec. 4053. Por otro lado, el Tribunal Supremo de Puerto Rico ha aclarado que la determinación de responsabilidad por los daños causados por falta de reparaciones necesarias en la cosa arrendada, existiendo la obligación impuesta por el artículo 1444, se rige por el Artículo 1054 del Código Civil, el cual requiere prueba de negligencia, dolo o morosidad del arrendador. *Arroyo v. Caldas*, 68 D.P.R. 689 (1948). ■

Las reparaciones exigidas al arrendador son las necesarias para conservar la cosa *"en estado de servir para el uso a que ha sido destinada"*. *Marín v. Montijo*, 109 D.P.R. 268, 275 (1979); *Maldonado v. Inter American University*, 104 D.P.R. 420 (1975). El Tribunal Supremo, citando a Scaevola, ■ ha definido las *"reparaciones necesarias"* a que se refiere el estatuto como *"aquéllas que subsanan... el desgaste natural de la cosa; los deterioros que el propio arrendador o personas de su dependencia produzcan; [y] las pérdidas que ocasione*

*un caso fortuito". Castro Anguita v. Figueroa* 103 D.P.R. 847, 852 (1975). A esto, Diez-Picaso y Gullón han añadido que *"la obligación de reparar debe limitarse a la mera corrección de deterioros, sin que pueda extenderse a lo que signifique reconstrucción o reedificación". Sistema de Derecho Civil*, Vol. II, 6ta. Ed., pág. 367. Véase, además, Lucas Fernández, *Comentarios al Código Civil y Compilaciones forales*, T. XX, Vol. 1, Ed. Revista de Derecho Privado, pág. 394. El arrendatario está obligado a dar advertencia, *"en el más breve plazo posible,"* de la necesidad de las reparaciones, según establece el Art. 1449 de dicho Código, 31 L.P.R.A. sec. 4056, en ausencia de lo cual se hace responsable del daño sufrido por el propietario a causa de su negligencia. Una vez cumplida dicha obligación, *"se encuentra en situación de exigir del arrendador las consecuencias que procedan de su omisión o negligencia, de las que sólo el arrendador será ya el responsable".* Manresa, *supra*, pág. 177. Sin embargo, la advertencia no es requerida para poder ejercer su derecho a rescindir el contrato y solicitar la compensación por los daños sufridos o sólo esto último, contemplado en el Art. 1446. Lucas Fernández, *supra*, pág. 492. El reclamante debe probar el incumplimiento de sus obligaciones y los daños y perjuicios. *Id.*, pág. 494.

Ahora bien, nuestro más alto foro ha indicado, citando a Manresa, ▇ que las disposiciones del Código Civil referentes a las obligaciones del arrendador y del arrendatario, son supletorias; es decir, subsisten a falta de pacto en contrario. *Castro Anguita v. Figueroa, supra.* Indica Lucas Fernández:

*"...hay que pensar que cuando por pacto se dispensa al arrendador de la obligación que comentamos, incidirá tal dispensa en una mayor carga para el arrendatario en orden a las reparaciones que la cosa necesite... [S]e deduce la conveniencia de precisar en el contrato de arrendamiento... si todas las reparaciones serán de cargo del arrendatario... [o], en su defecto, cuáles correrán a su cargo, procurando redactar la oportuna cláusula de modo que no deje lugar a dudas."* Lucas Fernández, *supra*, pág. 391.

Los pactos de relevo de responsabilidad, o *"hold harmless clause"*, ▇ pueden tener el efecto de exceptuar a las partes de la aplicación de las normas discutidas. En *Chico Ramos v. Editorial Ponce, Inc.*, 101 D.P.R. 759, 778-779 (1973), el Tribunal Supremo estableció las normas a seguir en su aplicación:

*"Las cláusulas de exoneración no son favorecidas. En el pasado, hemos repudiado las cláusulas contractuales dirigidas a exonerar a priori, a un contratante por los daños causados posteriormente al otro contratante por actos negligentes del primero.*

*El Código Civil consagra la libertad de contratación, pero señala que la voluntad de los contratantes no puede ser contraria a las leyes, a la moral, ni al orden público. El Art. 4 del mismo Código dispone que los derechos concedidos por las leyes son renunciables a no ser esta renuncia contra la ley, el interés o el orden público o en perjuicio de tercero.*

*La renuncia de derechos autorizada por el Art. 4 del Código debe ser clara, terminante e inequívoca. Más aún, debe ser esto así cuando se trate de convenios en los cuales se exonere de responsabilidad a una persona por sus futuros actos negligentes. Sostuvimos allí [en Cabrera v. Doval, 76 D.P.R. 777, 781 (1954)], al revocar una sentencia que declaró sin lugar una demanda de daños y perjuicios dictada en base a un relevo a priori de responsabilidad, que:*

*'Como regla generalmente aceptada, se establece la de que estos convenios sobre exoneración de responsabilidad no son favorecidos por la ley; y deben, por tanto, ser interpretados estrictamente en contra de la parte que descansa en ellos para liberarse de responsabilidad, y si posible, su interpretación debe ser contraria a la exoneración. Para que una parte quede exonerada de las consecuencias de su propia negligencia, el lenguaje usado en el documento de descargo debe indicarlo así, en forma clara y explícita. Algunas cortes sostienen, a nuestro juicio con buen sentido, que el lenguaje exculpando de responsabilidad por negligencia debe ser explícito, bien haciéndose referencia expresa a la negligencia, o bien indicando tal intención en términos inequívocos'.*

*Un factor importante en la determinación de la validez de una cláusula de relevo depende de la fuerza en la negociación de cada uno de los contratantes. Si no se encuentran en igualdad de condiciones y de fuerza, de manera que una parte se encuentra obligada. a aceptar el relevo de responsabilidad por negligencia de la otra parte, el relevo es nulo."* (Citas omitidas)

Véanse, *Carrasquillo v. Am. Missionary Association*, 61 D.P.R. 867 (1943); *Rivera v. San Juan Racing*, 90 D.P.R. 414 (1964); *Castro v. Supermercados de Descuentos*, 99 D.P.R. 851 (1971). Otra modalidad de este tipo de acuerdos es la cláusula de relevo e indemnización, la cual:

*"...permite a una parte ser resarcida y protegerse de cierto riesgo colocándolo sobre la otra; así, garantiza que será compensada por cualquier pérdida o negligencia. Al fijarse esa responsabilidad contractual, las partes anticipan el ámbito de sus obligaciones y planifican de acuerdo a ello.*

*Obliga el reembolso por cualquier pérdida, daño o responsabilidad en que la otra persona incurra, mientras actúe a su requerimiento o beneficio. Ese resultado se impone aun cuando podría no ser primariamente responsable -en el sentido de culpabilidad-, lo es contractualmente. La cláusula puede asumir una o integrar varias formas de un acuerdo para proteger contra pérdida, sea causada por la propia negligencia; la del otro; un tercero; o para proteger de la responsabilidad frente al otro o terceros.*

*Como regla general, salvo legislación que las prohíba, las partes están en libertad de negociarla, incluso los varios grados de responsabilidad; a saber, única negligencia; concurrente entre las partes; y la absoluta. Si la intención es clara, los tribunales la aplicarán, a menos que sean contrarias al interés público. Igual enfoque subsiste en Puerto Rico. El Art. 4 del Código Civil, 31 L.P.R.A. sec. 4, en lo pertinente visualiza que "[l]os derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en perjuicio de tercero". La renuncia debe ser clara, terminante e inequívoca, más aún, cuando se exonere de responsabilidad a una persona por sus futuros actos negligentes."* (Citas omitidas) *Torres Solís v. Autoridad de Energía Eléctrica*, 136 D.P.R. 302, (1994).

Ahora bien, al evaluar la voluntariedad de la renuncia y la fuerza relativa de los contratantes, debemos tener presente el fenómeno descrito por Puig Brutau como "*contratos de adhesión*":

*"Hay que reiterar que en las sociedades industriales avanzadas, la organización económica se funda en la producción en masa y en la distribución también en masa, o entre una masa indeterminada de consumidores. Las fórmulas stándar o ajustadas a un prototipo unitario de contrato se imponen en las transacciones comerciales, en especial en la distribución de bienes y servicios al consumidor. Quizás más que contrato tendría que hablarse, dice Leinhoff, de fórmulas stándar en las transacciones comerciales ... [E]l contrato no queda redactado como efecto de una negociación, con su tira y afloja (give-and-take bargain), sino que se trata de que el cliente no puede discutir las condiciones del contrato (excepto algunos extremos secundarios) que le presenta ya redactado la otra parte."*

El Tribunal Supremo de Puerto Rico, al discutir este tipo de contrato, se ha pronunciado con cautela:

*"En nuestra jurisprudencia, hemos interpretado el Art. 1240 del Código Civil, 31 L.P.R.A. 3478, que dispone que las cláusulas oscuras de un contrato no deben favorecer al que ocasionó la oscuridad, con especial rigor cuando se trata de contratos de adhesión. Claro está, el carácter poco favorecido que de estos contratos, según se describe en la anterior cita de Castán, va más allá del problema de las cláusulas oscuras. Hemos adaptado en Puerto Rico este importante concepto normativo aun cuando el problema ante nos no era uno de cláusulas oscuras."* (Citas omitidas) *Arthur Young & C. v. Vega*, 136 D.P.R. 157 (1994, Op. Conc. Juez Fuster Berlingeri)

Véase, además, *Ferrer v. Lebrón García*, 103 D.P.R. 600 (1975). Además, la interpretación de un contrato de adhesión debe favorecer a la parte económicamente más débil y que nada tuvo que ver con su redacción.

*"Esta es la doctrina que reiteradamente hemos establecido en nuestro ordenamiento jurídico para promover, hasta donde ello sea posible, la igualdad jurídica en materia de contratación".* Herrera v. First Nat'l. City Bank, 103 D.P.R. 724, 727 (1975); Ferrer v. General Motors Corp., 100 D.P.R. 246 (1971). Sin embargo, *"[l]a adhesión no implica una declaración de nulidad del contrato".* Casanova Díaz v. Puerto Rican American Ins. Co., 106 D.P.R. 689, 697 (1978); C.R.U.V. v. Peña Ubiles, 95 D.P.R. 311, 314 (1967).

Por último, debemos tener presente tres principios de interpretación de contratos. En primer lugar, *"[l]as cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas".* Art. 1237 del Código Civil de 1930, 31 L.P.R.A. sec. 3475. Por lo tanto, *"los varios términos de un contrato deben leerse conjuntamente y armonizarse con el fin de determinar la intención de las partes".* Ulpiano Casal, Inc. v. Totty Mfg. Corp., 90 D.P.R. 739 (1964); Caballero v. Kogan, 73 D.P.R. 666 (1952). En segundo lugar, *"[p]ara juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato".* Art. 1234 del Código Civil, 31 L.P.R. A. sec. 3472, énfasis nuestro. En tercer lugar, *"[l]a interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad",* Art. 1240 del Código Civil, 31 L.P.R.A. sec. 3478. Estos dos últimos principios plantean problemas probatorios que es menester ventilar en una vista, en caso de precisar recurrir a ellos. A la luz de estos principios, veamos el efecto del conjunto de las cláusulas transcritas del contrato que nos ocupa.

Las cláusulas contractuales discutidas establecen los contornos de la responsabilidad del arrendador y el arrendatario por el cuidado del inmueble. Resulta evidente que la lectura conjunta de unas y otras no arroja un significado único e indiscutible que permita prescindir de prueba respecto a la intención de las partes, incluyendo su relativa fuerza negocial. Así, la sección 10.1 del contrato incorpora el deber impuesto al arrendador por el Artículo 1444 del Código Civil, *supra.* La sección 21.1 incorpora, a su vez, el remedio concedido al arrendador por los Arts. 1446 y 1054 del Código Civil, *supra.* La sección 10.2 especifica la forma en que el arrendatario debe cumplir su deber de cuidar el bien arrendado como buen padre de familia, estatuido en el segundo inciso del Art. 1445 del Código Civil, 31 L.P.R.A. sec. 4052 (2). Las secciones 10.3 (a), (b) y (d), por su parte, protegen al arrendador contra acciones legales que surjan de daños a terceras personas o sus propiedades por causa de accidentes o incidentes ocurridos en relación con el local arrendado o las áreas comunes del centro comercial. También lo relevan de responsabilidad, dentro de los límites establecidos por ley, por toda reclamación que surja de la ocupación y uso del local o de su condición o estado de reparación, así como por defectos en los edificios o mejoras practicadas al centro comercial o en alguno de los equipos en ellos contenidos, o por daños a la persona o la propiedad o negocio del arrendatario o reclamados a través de éste, que sean causados por la rotura o filtración de agua, vapor o gas en cualquier parte del local o causada por actos fortuitos o por la negligencia en la ocupación, construcción, operación o uso de los edificios o mejoras en el centro comercial, o de alguno de los equipos en él contenidos. A su vez, en lo pertinente, la sección 10.5 impone al arrendatario el deber de obtener y mantener en vigor una cubierta de seguro sobre responsabilidad general y daño a la propiedad en el local, contra daños causados por agua o por salideros del sistema de rociadores.

Ante lo anterior, nos hacemos eco de las palabras de nuestro más alto foro, cuando enunció respecto a la división de obligaciones y responsabilidades pactadas en otro contrato de arrendamiento, que *"[h]emos examinado el contrato y no es un modelo de claridad".* Al igual que en el caso que nos ocupa, en aquél la arrendadora alegaba que las disposiciones del contrato sustituían, por voluntad de ambas partes, las obligaciones dispuestas por el Código. En cuanto a esto, aclaró el Tribunal: *"Las cláusulas del contrato, por ser conflictivas y oscuras, no pueden interpretarse para hacer inaplicable [la] disposición supletoria de voluntad que establece el Código".* Maldonado v. Inter American University, *supra,* páginas 424 y 425.

La reclamación que nos ocupa aduce una serie de supuestos de hechos de cuya prueba dependerá la obligación que tenga cada una de las partes a la luz de las disposiciones del contrato. Estos se reiteraron en la oposición a sentencia sumaria y en la declaración jurada que forma parte de ésta, trabándose claramente una

controversia sobre los hechos. En esas circunstancias, el tribunal debió tomar como ciertas las alegaciones fácticas de la parte reconvencionista para propósitos de la resolución de la solicitud de sentencia sumaria y resolver la controversia de hechos en contra de la parte que solicitó la disposición sumaria del caso. Resolvemos que la reconvención plantea cuestiones probatorias que no deben resolverse mediante el mecanismo de sentencia sumaria y que el tribunal de instancia erró al adoptarlo como medio de solución de este pleito. ■

En vista de la conclusión a la que llegamos en cuanto al primer señalamiento de error, no es necesario discutir el segundo. ■

Por lo anteriormente señalado, revocamos la sentencia dictada por el Tribunal de Primera Instancia y devolvemos el caso para su resolución en los méritos.

Lo acordó y manda el Tribunal y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

### ESCOLIOS 2001 DTA 171

**1.** La demandante en este caso fue Vornado, Inc., empresa distinta a Big Beaver, compareciente al contrato de arrendamiento. Sin embargo, esta distinción no se levantó en instancia y no es motivo de controversia en apelación.

**2.** Arts. 1044, 1206, 1207, 1210, 1213, 1230 y 1233 del Código Civil de 1930, 31 L.P.R.A. secs. 2994, 3371, 3372, 3375, 3391, 3451 y 3471.

**3.** Dicho Artículo lee: "*Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas*". 31 L.P.R.A. sec. 3018. Aclara Lucas Fernández que la relación entre el Art. 1054 y el 1446 es de especialidad. Lucas Fernández, *supra*, pág. 493. Manresa, a su vez, indica que este último es aplicación del primero, pero de aplicación preferente en casos de arrendamientos. Manresa, *supra*, págs. 157 y 162.

**4.** Código Civil, ed. 1952, tomo XXIV, pág. 518.

**5.** Código Civil Español, ed. 1950, tomo X, pág. 542.

**6.** Traducción hecha en *Castro Mesa v. Supermercado de Descuentos*, 99 D.P.R. 851, 853 (1971).

**7.** Es menester comentar el hecho de que la sentencia sumaria emitida era claramente un proyecto de sentencia sometido por el abogado de Manley. Lee en todo momento como un escrito en apoyo de la solicitud de sentencia sumaria, al punto de referirse al tribunal como "*este Honorable Foro*" (p.3) y en la última página, aparecen unos blancos correspondientes a las sumas de dinero a concederse por concepto de honorarios de abogado y la fecha de la sentencia. El juez firmante completó a mano y en tinta los espacios en blanco e incluso salvó dicha información con sus iniciales. Además, la sentencia finaliza con una nota que indicaba que el documento había sido extraído de la memoria de un ordenador con el nombre "*562/562-94 solicitud -sent-sumaria*". Sobre este proceder, nuestro Tribunal Supremo se ha expresado del siguiente modo:

"*Varias son las ocasiones en que este Tribunal ha manifestado su preocupación sobre ello. Como es sabido, hemos expresado que a pesar de que no existe una prohibición como tal al respecto, dichos proyectos únicamente deben ser utilizados como "documentos de trabajo" ("working papers"). Ello debido a que la sentencia que emite un tribunal de instancia debe enteramente ser el producto del pensamiento, análisis y criterio jurídico del juez sentenciador y no de los abogados de las partes.*" Lasso v. Iglesia Pentecostal La Nueva Jerusalem, 129 D.P.R. 219 (1991, Op. Conc. y Dis., Rebollo López).

Además, *"debemos recordar que, infortunadamente, la parte que lo prepara, por lo general, intenta 'salir por la puerta ancha' en todos los aspectos del caso y que jamás un proyecto de sentencia recoge el verdadero sentir, ni la opinión del juez que la emite, ni cuál es el verdadero propósito detrás de la celebración de un juicio plenario ante determinado magistrado".* Román Cruz v. Díaz Rifas, 113 D.P.R. 500, 508 (T.S. 1982). Véanse, *Malavé v. Hospital de la Concepción,* 100 D.P.R. 55 (1971); *Arroyo v. Rattan Specialties Inc.,* 117 D.P.R. 35 (1991); *Báez v. Cooper,* 120 D.P.R. 145 (1987); Canon 2 de los Cánones de Etica Judicial.

**8.** En apoyo a su segundo señalamiento de error, Flores y Sanz argumentan que aun si Manley tuviera razón en los planteamientos incluidos en su solicitud de sentencia sumaria, dos de las reclamaciones no podían ser adjudicadas, toda vez que no surgieron de las cláusulas contractuales que fueron interpretadas en la sentencia sino de los actos directos de Manley y tratan de reclamaciones por ganancias dejadas de percibir y por angustias mentales. Si bien la presente acción surge en sus inicios de una relación contractual, la cual hemos discutido hasta ahora, *"[e]n el contexto de la relación contractual entre un arrendador y su arrendatario, hemos expresado que esto no impide, en casos apropiados, la acción en daños y perjuicios bajo el Art. 1802 del Código Civil."* Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712 (1992). El Art. 1807 del Código Civil de 1930 especifica la responsabilidad aludida, ya que *"[e]l propietario de un edificio es responsable de los daños que resulten de la ruina de todo o parte de él, si ésta sobreviniere por falta de las reparaciones necesarias".* 31 L.P.R.A. sec. 5146. Cuando una acción *"se dirige a obtener el resarcimiento de los daños causados por una omisión del arrendador -efectuar las reparaciones necesarias-, y se enmarca dentro del precepto general de la responsabilidad extracontractual. (Cita omitida) No le sería estrictamente aplicable una disposición que propende al cumplimiento del contrato".* Oller v. Purcell Bauzá, 92 D.P.R. 148, 155 (1965); *Torres v. Fernández,* 56 D.P.R. 482 (1940). De este modo, la fuente de la responsabilidad de Manley alegada respecto a estas reclamaciones era independiente de la acción de daños por incumplimiento contractual. Sin embargo, el tribunal *a quo* no discutió este extremo. Incidió en error al así actuar.