NIVIA HERRERA, demandante y recurrida, *v.* FIRST NATIONAL CITY BANK, demandado y recurrente.

*Número:* R-71-140 *Resuelto:* 22 de abril de 1975

*McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria, Samuel T. Céspedes* y *A. Joaquín Yordán,* abogados del recurrente; *Carlos Santos Correa, Luis E. López Correa* y *Luis A. Lugo, Jr.,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Gira este recurso en torno a la eficacia del cheque del gerente en el tráfico bancario.

El recurrente, First National City Bank, sostiene la tesis de que el cheque del gerente, al igual que cualquier cheque ordinario que se deposite en una cuenta corriente, se recibe únicamente para ser transmitido al cobro; razón por la cual —argumenta—el depositante no puede girar sobre su importe hasta que el banco haya realizado su cobro.

Conviene que hagamos un breve examen de los hechos pertinentes del caso para una mejor comprensión de la discusión.

La recurrida Nivia Herrera depositó el 7 de octubre de 1968 en la cuenta corriente que tenía abierta en el First National City Bank, sucursal de Hato Rey, un cheque del gerente expedido a su favor por el Chase Manhattan Bank por la cantidad de $3,497.00. Al día siguiente ella giró un cheque personal contra esta cuenta por la cantidad de $3,000.00 a favor de su patrono James T. Barnes and Company, quien se lo cambió por dinero en efectivo. El 9 de octubre Nivia salió de vacaciones a la República Dominicana donde se proponía pasar el resto del mes de octubre. Dos días después, el First National City Bank le notificó por correo que había devuelto el

cheque a favor de James T. Barnes and Company por insuficiencia de fondos en su cuenta corriente. El Aviso de Débito expresa la razón de la deducción del cheque en el idioma inglés como "unc. funds". (Exhb. 1 demandada.) Tan pronto Nivia se enteró del aviso de débito regresó a Puerto Rico sufriendo contratiempos y humillaciones.

El tribunal de instancia concluyó que el recurrente First National City Bank no había cumplido su obligación contractual de efectuar el pago del cheque expedido por la recurrida declarando con lugar la demanda de daños y perjuicios y, en su consecuencia, condenó al First National City Bank a pagarle a ésta $4,000 en concepto de daños. No impuso honorarios de abogado.

El First National City Bank fundamenta su recurso de revisión esencialmente en dos argumentos: a) que el contrato de depósito entre las partes dispone que todos los valores que no fueran pagaderos en la sucursal del banco en que fueran depositados serían recibidos únicamente para ser transmitidos al cobro, y b) que la práctica bancaria establecida es al efecto de que un documento o valor pagadero en otro banco o sucursal que aquél en que se depositó, se le da un período de tenencia de cuatro días laborables, teniéndose por incobrados dichos valores hasta que los fondos representados por los mismos sean efectivamente recibidos por el banco en el cual se depositaron. De ahí, concluye el recurrente que Nivia Herrera no podía girar contra los fondos representados por el cheque del gerente depositado por ella hasta que el banco librador, Chase Manhattan Bank, hiciera efectivo dicho cheque.

■ El contrato de depósito bancario es uno típico de adhesión. Sus cláusulas aparecen impresas en un formulario y no están sujetas a discusión entre las partes. El depositante las acepta o las rechaza, quedando constreñido al mínimo su supuesta libertad para contratar. El Código Civil contrarresta esta desigualdad en la contratación preceptuando en el Art. 1240 que: "La interpretación de las cláusulas obscuras de

un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad." 31 L.P.R.A. sec. 3478.

■ En el contrato de adhesión este precepto se aplica con mayor fuerza, debiendo su interpretación favorecer a la parte económicamente más débil y que nada tuvo que ver con su redacción. Esta es la doctrina que reiteradamente hemos establecido en nuestro ordenamiento jurídico para promover, hasta donde ello sea posible, la igualdad jurídica en materia de contratación. *Ferrer* v. *General Motors Corp.*, 100 D.P.R. 246–257 (1971); *Barreras* v. *Santana*, 87 D.P.R. 227 (1963); *Maryland Cas'y Co.* v. *S. J. Rac'g Assoc., Inc.*, 83 D.P.R. 559 (1961) y *Zequeira* v. *C.R.U.V.*, 83 D.P.R. 878 (1961).

A la luz de los principios antes expuestos, procederemos ahora a examinar la cláusula del Convenio de Cuenta Corriente en que fundamenta el First National City Bank su caso. Dicha cláusula lee:

"4. Todos los valores que no sean pagaderos en la Sucursal de este Banco en que sean depositados y los documentos relativos (incluyendo documentos girados contra o pagaderos en otras oficinas o Sucursales de este Banco) son recibidos únicamente para ser transmitidos, a riesgo del depositante, por correo u otros medios; y, sin responsabilidad para este Banco, pueden ser enviados directamente o en circuito a través de cualesquiera de las Sucursales, oficinas o corresponsales del Banco, sujeto a los reglamentos de ellos, o enviarlos directamente al girado, librador o agente pagador para obtener en todo caso su pago en efectivo, abono al Banco remitente, o giro o certificación del girado, librador banco pagador o cualquier otro Banco; todo ello sin responsabilidad de parte de este Banco por cualquier acto, negligencia u omisión de cualquier corresponsal, agente o subagente. El abono hecho por tales valores, si alguno, será provisional, y podrá ser revocado en cualquier momento antes de haberse recibido el pago total en efectivo en la sucursal de este Banco donde se haya hecho el depósito".

El recurrente imparte a dicha cláusula una interpretación absolutista aplicándola indiscriminadamente a todos los

valores sin distinción. No toma en cuenta la naturaleza de los diversos valores ni las diferencias fundamentales que distinguen al cheque ordinario del cheque del gerente.

La cláusula en cuestión no define el término "valores" y su contexto no permite inferir un propósito tan abarcador como el que propone el recurrente cuando hay una compleja diversidad de valores en el tráfico bancario.

■ El cheque del gerente es uno en que el propio banco que lo expide es librador y librado. Al expedirlo, el banco garantiza que los fondos representados por el cheque han sido reservados para beneficio del tomador. El pago no puede revocarse, aunque hay situaciones excepcionales que se pueden revocar como son los casos de fraude o cuando han sido expedidos sin causa. Michie: *On Banks and Banking*, Tomo 5B, sec. 251, 10 Am.Jur.2d, Banks, secs. 544, 643, 9 C.J.S., *Banks and Banking*, sec. 173, Anno. *Bankers Check-Stopping Payment*, 1463, 1464. El tomador tiene en efecto la garantía de la solvencia del banco librador que se compromete al pago.

■ Estos atributos especiales del cheque del gerente son los que han determinado que circulen en el tráfico bancario como si fueran dinero en efectivo. Generalmente se aceptan como si fueran dinero en efectivo precisamente por la certeza que hay en su cobro.

El propio recurrente lo considera como dinero en efectivo a los fines de la reserva legal. Así lo declaró el testigo José A. Maldonado, Gerente Auxiliar de una sucursal del recurrente:

"P. ¿Diga si es o no cierto que un cheque del gerente desde el momento en que se presenta al First National City Bank, puede ser incluido en su pago como una reserva legal a tenor con las leyes de Puerto Rico?

R. Sí señor.

P. ¿Incluye una reserva legal del banco?

R. Sí señor.

P. ¿Se incluye como dinero en efectivo?

R. Sí señor." (T.E. págs. 66–67.)

Las transacciones más importantes en la comunidad se llevan a cabo mediante cheques del gerente o cheques certificados—en este aspecto ambos son equivalentes, Michie, *op. cit.* —eliminándose así las inconveniencias del papel moneda.

Los formidables atributos que distinguen a estos cheques de los ordinarios nos llevan a la conclusión de que los mismos no están incluidos en el término genérico "valores" a que alude el Convenio de Cuenta Corriente. Esto es, al depositarse en una cuenta corriente no son recibidos, como lo son los cheques ordinarios, para ser transmitidos al cobro pudiendo el depositante, desde luego, girar contra su importe.

De esta manera se fortalece la circulación de estos cheques rodeándolos de la mayor garantía para que se pueda recibir con la confianza y seguridad con que se recibe el papel moneda.

Por supuesto, en virtud del contrato de cuenta corriente el banco sólo viene obligado a honrar los cheques expedidos por el depositante siempre y cuando haya fondos suficientes en depósito. No tiene la obligación de aceptar cheques del gerente ni documentos de otros bancos. En cuanto a éstos puede imponer las condiciones que estime razonables. Lo único que resolvemos es que en el caso de autos los cheques del gerente no están incluidos en la cláusula del Convenio de Cuenta Corriente que impone la condición a otros valores de ser recibidos únicamente para ser transmitidos al cobro. Nada impide imponer tal condición a los cheques del gerente.

El segundo argumento del recurrente se apoya en una práctica bancaria a los efectos de que todo valor pagadero en otro banco o sucursal que aquél en que se depositó, se le da un período de espera de cuatro días laborables, teniéndose por incobrados dichos valores hasta que el importe de los mismos sea efectivamente recibido por el banco en el cual se depositaron.

De acuerdo con la prueba desfilada dicha práctica fue adoptada por la Asociación de Banqueros para regular las relaciones entre los bancos miembros de la Cámara de Compen-

saciones (*Clearing House*). Véase el testimonio de José A. Maldonado Colón, Gerente Auxiliar de una de las sucursales del recurrente. (T.E. pág. 56.)

■ Los razonamientos que expusimos anteriormente para disponer del primer argumento son de entera aplicación a este segundo argumento. Si los cheques del gerente no están sujetos a ser revocados y generalmente se aceptan por el público como si fueran dinero en efectivo, aceptándolos también los bancos como dinero para los fines de la reserva legal, no vemos como una práctica bancaria adoptada por una entidad ajena al contrato de cuenta corriente puede modificar dicho contrato y afectar los derechos de los depositantes que nada tuvieron que ver con su adopción. La Cámara de Compensaciones es una entidad establecida para conveniencia de los bancos participantes y sus reglamentos no pueden afectar los derechos de los depositantes. Michie, *op. cit.* 5A, pág. 17.

■ Por otro lado, no podemos considerar dicha práctica como un uso del comercio, fuente dinámica y flexible en la formulación de normas jurídicas mercantiles. Art. 2, Código Mercantil, 10 L.P.R.A. sec. 1002, Garríguez: *Los Usos del Comercio*, 28 Rev. Derecho Privado 822 (1944). Dicha práctica no reúne los requisitos de espontaneidad, generalidad y publicidad indispensables para adquirir rango de uso mercantil. Benito define estos requisitos de la siguiente manera:

"La espontaneidad en la producción de la regla jurídica quiere decir que surge instintivamente en el momento mismo en que se produce el hecho que requiere la regla. Este requisito es el que la diferencia sustancialmente de la ley, pues la ley es siempre producto artístico que requiere para su formación una elaboración reflexiva. La generalidad se consigue cuando la norma jurídica se manifiesta de un modo continuo y persistente en momentos distintos y en ocasiones idénticas, que se producen durante un cierto tiempo mayor o menor (pero nunca previamente determinado), según la importancia y naturaleza de la regla jurídica engendrada. Y la publicidad se supone que existe, cuando los hechos engendrados del uso se manifiestan de un modo

tan ostensible que no se oculte su conocimiento al pueblo o clase en cuyo seno surge, pues entonces puede decirse que han sido sancionados por su asentimiento". Benito, I *Derecho Mercantil*, págs. 240–241 (Tercera Edición).

La práctica en cuestión surgió por acuerdo deliberado de la Asociación de Banqueros para regular las relaciones de los bancos miembros de la Cámara de Compensaciones. No surgió, pues, espontáneamente. Dicha práctica tampoco se aplica uniformemente. La prueba desfilada indica que el banco exime a determinados clientes del período de espera. (T.E. pág. 57.)

Están ausentes del caso los requisitos de generalidad y espontaneidad, y, no hay prueba de que se le haya dado al período de espera la debida publicidad para que se manifieste de "un modo tan ostensible que no se oculte su conocimiento al pueblo."

Ciertamente los usos del comercio constituyen una valiosa ayuda para la interpretación de las cláusulas dudosas de un contrato. *Portilla* v. *Banco Popular*, 75 D.P.R. 100 (1953). Pero aún considerando dicha práctica bancaria como un uso, la misma tendría muy poca o ninguna utilidad para la interpretación del Convenio de Cuenta Corriente porque adolece del mismo vicio de ambigüedad que éste. El período de espera se refiere en forma genérica a todos los valores, al igual que el Convenio de Cuenta Corriente, sin tomar en consideración la diversidad de valores en el tráfico bancario y las diferencias fundamentales entre éstos.

Estamos de acuerdo con el recurrente en que la partida de $4,000 por concepto de daños y perjuicios es excesiva, por lo que debe reducirse a la cantidad de $2,000.

*Se dictará sentencia confirmando la recurrida y reduciendo a $2,000 la partida por concepto de daños.*