EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Daniel Suárez Figueroa, Maribel Velázquez Rosa<br><br>Peticionarios<br><br>vs.<br><br>Sabanera Real, Inc., y/o P.R.D., L.P.; Century Development Group; Jaime López<br><br>Recurridos | Certiorari<br><br>2008 TSPR 71<br><br>173 DPR \_\_\_\_ |

Número del Caso: CC-2004-118

Fecha: 6 de mayo de 2008

Tribunal de Apelaciones:

      Región Judicial de Caguas, Humacao y Guayama

Juez Ponente:

      Hon. Carlos Soler Aquino

Abogado de la Parte Peticionaria:

      Lcdo. Ángel Marrero Figarella

Abogado de la Parte Recurrida:

      Lcdo. Rafael Brás Benítez


Materia: Incumplimiento de contrato

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Daniel Suárez Figueroa, Maribel
Velázquez Rosa
          Peticionarios
                                          *Certiorari*

                          CC-2004-118

          v.

Sabanera    Real,    Inc.,    y/o
P.R.D.,        L.P.;        Century
Development Group; Jaime López
          Recurridos


Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta.


En San Juan, Puerto Rico, a 6 de mayo de 2008.

Debemos resolver si un urbanizador o constructor contra quien pende una querella en el Departamento de Asuntos del Consumidor por deficiencias en una propiedad opcionada, queda liberado de responsabilidad por prácticas indeseables de construcción, según definidas por la Ley 130 de 13 de junio de 1967 y el Reglamento sobre la Construcción de Viviendas Privadas en Puerto Rico, si se firma la escritura de compraventa antes de resolverse la querella. Ello conlleva determinar si los compradores que firman una escritura de compraventa, según la cual aceptan el inmueble, "sin reservas", renuncian por esa sola razón a

una reclamación previamente presentada y pendiente de adjudicación.

I.

P.R.D., L.P., antes conocido como Sabanera Real, Inc. y Century Development Group, en adelante denominados "los desarrolladores" fueron los gestores de la Urbanización "Savannah Real", en el Municipio de San Lorenzo. El 5 de junio de 2000, el Sr. Daniel Suárez Figueroa y su esposa Maribel Velásquez Rosa, en adelante denominados "los compradores", otorgaron un contrato de opción de compraventa titulado "Contrato Uniforme de Compraventa" con Sabanera Real, Inc., para la adquisición de la unidad A-11, modelo Sevilla, del referido proyecto. En las especificaciones iniciales del proyecto se indica que la terminación de los plafones del techo interior de las unidades sería "skim coat plaster", o empañetado.

El 12 de noviembre de 2001, el señor Suárez Figueroa envió una carta al Sr. Franklin López, de Century Development Group, informándole que había visitado el proyecto y observado "que la terminación del plafón de las unidades ha sido cambiado a estucado a diferencia de lo que indican los planos de construcción donde muestra que deben ser empañetado". Solicita entonces al señor López "que intervenga en esta situación específicamente en la unidad A-11", que era la que él había opcionado, junto a su esposa. Poco tiempo después, el 25 de noviembre de 2001, el señor Suárez Figueroa escribió nuevamente, esta vez a

"Proyecto Savannah Real", para informar que el plafón interior no se había empañetado debidamente. Ese mismo día, el Ing. Jaime López, de P.R.D., L.P., le envió al señor Sánchez Figueroa copia de un memorando escrito por el Ing. Rafael E. Torrellas, en el que éste expresaba lo siguiente: "Como a la unidad del cliente aun no se le ha aplicado el estucado interior y solamente tiene el Skimcoat sugiero que con una carta del cliente aceptándolo, lo dejemos así y lo pintemos". Solicita entonces que el señor Sánchez Figueroa le indique por escrito lo que desea hacer. El 12 de diciembre el señor Sánchez Figueroa contestó a esta misiva, informando nuevamente que rechazaba la terminación en estucado y que debía dársele al plafón la terminación que indica el plano.

El 17 de diciembre de 2001, los desarrolladores, por medio de sus abogados, comunicaron a los compradores que a su entender la terminación en estucado, o "pearl-tex", mejora la apariencia de los techos, "[p]ero como usted insiste en su posición le informamos que si no está satisfecho con la terminación de los plafones de su futura casa... nuestro cliente está en la disposición de rescindir el contrato y devolverle íntegramente todo el dinero que usted ha pagado como opción o parte del pronto para la compra de su unidad". El 29 de enero de 2002, los compradores respondieron por escrito a esta misiva. Informaron que no tenían interés en resolver el contrato de compraventa y, por el contrario, "queremos seguir con el

contrato de compra de la unidad A-11." No obstante, solicitaron que se paralizaran los trabajos en los plafones interiores de la casa, "ya que hemos radicado una querella en DACO para que sea éste el que determine cuál es la terminación que por derecho corresponde aplicarle a las unidades".

Ese mismo día, los compradores presentaron una querella ante el Departamento de Asuntos del Consumidor, en adelante DACO, en la cual indicaron que no estaban dispuestos a aceptar el cambio en la terminación de los plafones y solicitaron "que se trabajen los plafones de acuerdo a los planos de ARPE y/o que el Departamento tome acción como corresponda en ley". Pendiente aún la querella en DACO, el 28 de febrero de 2002, los compradores adquirieron la unidad A-11 de la urbanización. La vista para dilucidar la querella se celebró el 1 de julio de 2002 y el 13 de noviembre de 2002 se emitió el dictamen recurrido.

DACO resolvió que los desarrolladores violaron la Ley de la Oficina de Oficial de Construcción, 17 L.P.R.A. sec. 502 *et seq.* (en adelante, Ley del Oficial de Construcción), al alterar los planos aprobados por ARPE "de manera unilateral y sin notificación". Específicamente, resolvió que se violó el artículo 9, inciso (c) de dicha ley, 17 L.P.R.A. sec. 509(c), que prohíbe la alteración de los planos aprobados sin que antes se haya avisado "a los optantes y/o compradores, mediante correo certificado con

acuse de recibo con por lo menos veinte (20) días de antelación a la presentación de las enmiendas solicitadas". A la luz de esta determinación, la agencia ordenó a los desarrolladores remover el terminado de "pearl-tex" o estucado y aplicar en su lugar el terminado "skim coat plaster", que era el previsto en el plano aprobado por ARPE para el techo de la residencia de la parte querellante. De incumplir con esta orden, los querellados vendrían solidariamente obligados a pagarle a los querellantes la suma de tres mil quinientos dólares ($3,500).

En reconsideración, la agencia se reafirmó en su decisión de ordenar que se terminara el techo de la residencia de los querellantes conforme los planos aprobados por ARPE. Además señaló una vista evidenciaria para que las partes presentaran "prueba del costo de remoción y terminado del techo en la residencia en controversia". Esto a ruego de los querellantes, quienes alegaron que los trabajos de remoción del estucado y empañetado costaban más que la penalidad impuesta en la resolución en caso de incumplimiento.

Presentado el recurso de revisión ante el foro apelativo, los desarrolladores argumentaron, principalmente, que el DACO erró al descartar prueba documental que, según alegaban, demostraba que los querellantes habían aceptado la obra sin reserva o reclamo de clase alguna. Relacionado a esto, argumentaron que la agencia erró al interpretar que el incumplimiento con el

requisito de notificación de cambios era una práctica indeseable de construcción. El Tribunal de Apelaciones revocó la resolución recurrida y resolvió que los compradores habían condonado el incumplimiento de los desarrolladores con los planos, al firmar la escritura de compraventa sin expresar objeción alguna y sabiendo que se habían cambiado las terminaciones del techo. Para llegar a esta conclusión, el foro apelativo se fundamentó en la cláusula séptima de la escritura, que expresa que los compradores: "(a) han inspeccionado la propiedad objeto de esta compraventa, (b) la propiedad ha sido aceptada luego de tal inspección la que, a su mejor entender, se encuentra libre de defectos o vicios de construcción y la adquiere y acepta como está (as-is) [sic] sin reclamo o reserva de clase alguna."

Recurren ahora los compradores alegando que el Tribunal de Apelaciones erró al revocar a DACO "y negarse a aplicar lo resuelto en Pacheco v. Estancias de Yauco". Los peticionarios aducen que no obstante lo expresado en la escritura de compraventa, cumplieron con el requisito de protestar los vicios ostensibles que conocían y recibieron el edificio sujeto a reserva. Entienden que con su rechazo consistente del cambio en la terminación del plafón interior, la presentación de la querella el 29 de enero de 2002 y, particularmente, sus expresiones en la carta dirigida a los desarrolladores ese mismo día, se reservaron el derecho de continuar con su caso en el Departamento de

Asuntos del Consumidor y, por ende, no renunciaron al remedio provisto al amparo del artículo 9(c) de la Ley del Oficial de Construcción, *supra*. Argumentan los peticionarios que la decisión del Tribunal de Apelaciones dejaría en las manos de los constructores de hogares el uso de "argucias", como las que alegan fueron utilizadas en la escritura de compraventa del presente caso, para castigar a la parte más débil en la relación contractual. Por eso, exponen que hay razones de orden público para impugnar la validez de la cláusula séptima de la escritura.

Los recurridos, por su parte, se amparan en que el cambio en la terminación del plafón no constituye vicio de construcción ni es causa de ruina funcional o de cualquier otra clase. Por eso, el artículo 1483 del Código Civil no es pertinente al caso de autos y, por consiguiente, tampoco lo es nuestra decisión en Pacheco v. Estancias de Yauco, 160 D.P.R. 409 (2003). Asimismo sostienen que el cambio es una mera modificación a los planos y especificaciones del proyecto que fue posteriormente aprobado por ARPE. Principalmente, se apoyan en la cláusula séptima de la escritura de compraventa, según la cual los compradores aceptaron la propiedad "como está" ("as is"), sin reserva alguna. Rechazan que esta cláusula constituya una argucia y aducen que es, más bien, "una expresión clara e inequívoca de la voluntad de dicha parte, quien adquiere la propiedad sin reclamo o reserva de clase alguna, incluyendo la renuncia a los reclamos por los cambios en la terminación

del techo de la residencia". Por haber aceptado la propiedad "como está", concluyen que no hubo incumplimiento de contrato. Más aun, alegan que fue a ellos, los desarrolladores, a quienes se violó su confianza, en tanto descansaron en que los compradores renunciaban a su reclamación ante DACO al firmar la escritura de compraventa.

Expedimos el auto de certiorari el 16 de marzo de 2004 y, luego de una paralización por procedimientos pendientes ante el Tribunal de Quiebras, pasamos a resolver con el beneficio de la comparecencia de ambas partes.

II.

En Pacheco Torres v. Estancias de Yauco, supra, resolvimos, en esencia, que "la recepción definitiva del edificio no libera al contratista de responsabilidad por los vicios que causan la ruina del inmueble, sean éstos ocultos o aparentes, cuando estos últimos perceptibles a simple vista constituyen un incumplimiento del contrato de construcción". Resulta evidente que esta decisión descansa en que los vicios de construcción alegados después que se recibe la obra, tanto los ocultos como los aparentes, conlleven la ruina del inmueble, algo que no sucede en el presente caso. Además, en Pacheco Torres, supra, aclaramos que por la naturaleza de los vicios alegados, la situación se ubicaba dentro del marco normativo del artículo 1483 del Código Civil, 31 L.P.R.A. sec. 4124 y no en las

disposiciones del Reglamento sobre la Construcción de Viviendas Privadas en Puerto Rico, Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor. En el caso que nos ocupa, como veremos, sucede todo lo contrario. Por eso, el foro apelativo no se equivocó al negarse a aplicar la doctrina de Pacheco Torres v. Estancias de Yauco, supra, a los hechos de este caso. Sin embargo, ello no es suficiente para disponer del recurso, según explicamos a continuación.

DACO es la agencia llamada a proteger los intereses de los compradores de vivienda en Puerto Rico y de los consumidores en general. Como ya hemos apuntado en ocasiones anteriores, esta agencia fue creada mediante la Ley Núm. 5 de 23 de abril de 1973, 3 L.P.R.A. sec. 341 *et seq.*, con el propósito primordial de vindicar e implementar los derechos del consumidor. De conformidad con este propósito se le concedieron amplios poderes, entre los cuales se incluyeron específicamente los siguientes:

> (d) Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación administrativa **con plenos poderes para adjudicar las querellas que se traigan ante su consideración** y conceder los remedios aptos conforme a derecho, disponiéndose que las facultades conferidas en este inciso podrá delegarlas el Secretario en aquel funcionario que él entienda cualificado para ejercer dichas funciones.

> (i) **Interponer cualesquiera remedios legales que fueran necesarios para hacer efectivos los propósitos de esta ley** y hacer que se cumplan las reglas, reglamentos, órdenes, resoluciones y determinaciones del

Departamento. 3 L.P.R.A. sec. 341e(d) e (i).
(Énfasis nuestro.)

Ciertamente, la referencia clara a "cualesquiera remedios" en la ley indica que DACO posee amplios poderes para dictar las acciones correctivas que sean necesarias para cumplir con el mandato de su ley habilitadora, es decir, para proteger a los consumidores. Así lo hemos interpretado anteriormente, véanse, entre otros, Quiñones Irizarry, et al. v. San Rafael Estates, SE, 143 D.P.R. 756,765-67 (1997) y Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 220 (1974).[1] De esa forma y contrario a lo que alegaron los recurridos ante el tribunal apelativo, DACO puede ordenar medidas correctivas, incluyendo reparaciones, compensación de daños o el cumplimiento específico con los planos aprobados por ARPE, como ocurrió en el presente caso. Por tanto, a este punto podemos concluir que el remedio provisto por el juez administrativo de DACO, en cuanto ordenó que los desarrolladores removieran la terminación de estucado y la sustituyeran por

---

[1]   Hernández Denton v. Quiñones Desdien, supra, trataba sobre una querella, a raíz de la cual ASERCO, agencia predecesora de DACO, concluyó que un contratista había incumplido el contrato de construcción y le ordenó reparar las filtraciones y otras imperfecciones del inmueble o entregarle a la querellante mil ochocientos seis dólares con setenta y cinco centavos ($1,806.75), cantidad representativa del costo de las reparaciones. El contratista no acató la resolución del Director de ASERCO, quien recurrió al Tribunal Superior. Dicho foro resolvió que ASERCO no tenia facultad para adjudicar derechos antes de la vigencia del Art. 6(g) de la Ley Orgánica del Departamento de Asuntos del Consumidor, 3 L.P.R.A. sec. 341e(g), que otorgaba facultad a la agencia para resolver y adjudicar querellas presentadas por consumidores. Revocamos y establecimos específicamente que ASERCO siempre tuvo poder para dictar órdenes correctivas y que tal poder podía ejercerse hoy día por DACO.

el empañetado, so pena de tener que pagar $3,500.00, está dentro de las amplias facultades de dicha agencia.

En el marco de esas amplias facultades es que DACO viene llamado a aplicar la Ley Núm. 130 de 13 de junio de 1967 (en adelante Ley 130). Ésta creó la Oficina del Oficial de la Construcción para, según expresa su título, "proteger a los compradores de vivienda". La exposición de motivos de la Ley 130 reconoce que en "un mercado de viviendas donde las reglas de oferta y demanda operan libremente... el ciudadano que anhela vivamente la posesión y disfrute de su propio hogar... es objeto de prácticas indeseables en el negocio de construcción...". En estas circunstancias, el comprador es el "ente más débil", lo cual justifica que el Estado le brinde su protección. Exposición de Motivos, Ley Núm. 130 de 13 de junio de 1967.[2]

De lo anterior se desprende una clara política pública a favor de los compradores de hogares y la dotación a DACO de amplias facultades para hacer cumplir esa política. Venimos llamados a interpretar las normas sobre prácticas indeseables de construcción de conformidad con esta clara intención legislativa. El artículo 9 de la Ley 130, *supra*, enumera estas prácticas e incluye entre ellas las siguientes:

---

[2] Todas las facultades y poderes de la Oficina del Oficial de la Construcción fueron transferidas a DACO mediante la Ley Núm. 160 de 9 de junio de 1976.

(c) Alter[a]r o modificar los planos de una vivienda o modelo aprobado por la Junta de Planificación y/o la Administración de Reglamentos y Permisos, disponiéndose que toda solicitud de enmienda a los planos o especificaciones del proyecto radicada ante la Junta de Planificación y/o la Administración de Reglamentos y Permisos deberá estar precedida de un aviso cursado por el urbanizador o constructor a los optantes y/o compradores, mediante correo certificado con acuse de recibo con por lo menos veinte (20) días de antelación a la radicación de las enmiendas allí solicitadas.

...

(e) Dej[ar] de corregir un defecto de construcción en una vivienda según éste sea definido por el reglamento puesto en vigor por el Oficial de Construcción. 17 L.P.R.A. sec. 509,

El artículo 10 de la ley, por su parte, regula el contenido de los contratos de opción o compraventa de viviendas. Entre otras cosas, requiere que el contrato de opción contenga el "derecho del comprador a examinar los planos y las especificaciones de la vivienda, y de visitar e inspeccionar el objeto del contrato, en acuerdo con el vendedor...". 17 L.P.R.A. sec. 510(b)(5). El contrato de compraventa también debe incluir:

... [el] derecho [del comprador] a resolver el contrato desde que se puede [sic] establecer que la unidad objeto del contrato, estuviere ésta en proceso de construcción o ya terminada, se aparta en forma sustancial de la especificada en el contrato, en cuyo caso se devolverán íntegramente al comprador los pagos que hubiere efectuado bajo el contrato de compraventa... Id., inciso (c)(4).

Este artículo dispone, además, "que el urbanizador o constructor de la unidad objeto del contrato será responsable de los daños y perjuicios que se causen al comprador por razón de defectos de construcción y por falsa representación sobre la unidad vendida...". Id., inciso (c)(6). Igualmente establece que será causa para resolución, por el optante o por el comprador, el que "éste perciba que la unidad que se le está construyendo o haya de entregársele se diferencia en modo sustancial de la propuesta unidad a base de la cual él compró...". Id., inciso (f)(1).

Cuando el optante o comprador de vivienda detecte que se ha cometido una práctica indeseable, podrá presentar una querella en el Departamento de Asuntos del Consumidor, tras requerirle previa e infructuosamente al urbanizador o constructor que remedie dicha práctica. 17 L.P.R.A. sec. 511. Para resolver la querella, DACO podrá emplear todas las facultades y poderes conferidos por su Ley Orgánica. Id.

En 1977, DACO adoptó el Reglamento sobre la Construcción de Viviendas Privadas en Puerto Rico, *supra*, para facilitar la administración de la Ley 130 y la Ley Orgánica del Departamento. Este Reglamento contiene esencialmente las mismas disposiciones que la Ley 130. Así, en su sección 10, bajo el acápite de "prácticas indeseables", impone a todo urbanizador o constructor la obligación de informar a los compradores de un proyecto

"sobre toda solicitud de cambio de planos o especificaciones que se vaya a someter a la Junta de Planificación y/o ARPE", en cuanto a "[c]ambios en terminaciones: material de los pisos, terminación de pared y techos", entre otras cosas. El Reglamento requiere entonces que se conceda a dichos compradores un término de no menos de veinte (20) días antes de que se presente la solicitud de cambios, para que expongan sus objeciones ante ARPE.

También constituye una práctica indeseable de la construcción alterar o modificar los planos o especificaciones de una vivienda o modelo aprobado por ARPE. Reglamento, *supra*, sec. 10(c). Por último, el Reglamento le permite al comprador resolver el contrato de compraventa, mediante la debida notificación, cuando "perciba que la unidad que se le está construyendo o haya de entregársele se diferencia en modo sustancial de la especificada en el contrato." El uso de "materiales de diferente calidad a los especificados en perjuicio del comprador" constituye una diferencia sustancial que permite la resolución del contrato. Reglamento, *supra*, sec. 15. La posibilidad de resolución no es la única alternativa disponible al comprador, pues el Reglamento también dispone que cualquier optante o comprador podrá presentar una querella ante la agencia cuando entienda que el urbanizador o constructor ha incurrido en una práctica indeseable de construcción. Id., sec. 20.

III.

En el caso ante nuestra consideración, los compradores ejercieron su derecho a examinar la casa que habían opcionado, 17 L.P.R.A. sec. 510 (b)(5). Durante la inspección se percataron de que la construcción se apartaba del plano que habían examinado al firmar el contrato de opción. Específicamente, observaron cambios estéticos sustanciales que ARPE no había aprobado. De conformidad con la Ley 130, 17 L.P.R.A. sec. 511, alertaron al desarrollador sobre el desvío en el diseño y le requirieron que lo corrigiera. Esto lo hicieron en más de una ocasión, reiterando siempre que el plafón del techo debía empañetarse de acuerdo a lo estipulado en el plano. En respuesta a este requerimiento, los desarrolladores informaron a los compradores que si no estaban de acuerdo con la terminación del techo podían "rescindir" el contrato de opción.

Con sus actuaciones, los desarrolladores sugieren que el único efecto de su incumplimiento con los planos de construcción estipulados es hacer surgir, a favor de los optantes, un derecho a "rescindir" el acuerdo. Esa, sin embargo, no es la intención de la legislación y reglamentación aplicable. El optante o comprador no viene obligado a escoger entre resolver el contrato o aceptar los cambios unilateralmente impuestos por el desarrollador. Por el contrario, la posibilidad de resolver el contrato de

opción si se observan cambios sustanciales en el diseño es una **potestad** que la Ley 130 y el Reglamento conceden a los compradores. 17 L.P.R.A. sec. 510 (c)(4). El desarrollador siempre estará sujeto a la obligación de cumplir con lo estipulado.

Además, no podemos pasar por alto que cuando se hicieron las alteraciones a la casa de los peticionarios, ARPE no había autorizado la enmienda a los planos. De hecho, la autorización de ARPE se obtuvo después que los peticionarios examinaron su propiedad y observaron que el techo era distinto al plano del inmueble opcionado. Peor aún, los cambios fueron autorizados después de la resolución de DACO, lo cual demuestra que hasta ese momento los desarrolladores se hallaban en franca violación de ley.

También resulta sorprendente que la solicitud de cambios **nunca** fue notificada a los peticionarios, violentando así el mandato de la Ley 130 y del Reglamento sobre Construcción de Viviendas Privadas, que exigen que cualquier solicitud de enmienda a los planos de ARPE se notifique a los optantes por lo menos 20 días antes de presentarlos a la agencia. Las actuaciones de los desarrolladores privaron a los peticionarios de la oportunidad de exponer sus objeciones antes de que se presentaran las modificaciones y, peor aún, no les permitió acudir a ARPE para oponerse a las alteraciones propuestas por el desarrollador.

En resumen, las actuaciones de los desarrolladores constituyeron evidentes violaciones a la Ley 130 y al Reglamento sobre Construcción de Viviendas Privadas y eran, por tanto, prácticas indeseables en el negocio de la construcción. Los recurridos no han podido levantar ningún argumento jurídico que nos lleve a concluir que sus actuaciones eran lícitas o aceptables. Los hechos hasta aquí analizados confirman la sabiduría del legislador que hace casi cuatro décadas estableció una política protectora de los compradores de vivienda y demuestran por qué la propia Ley 130 llama a éstos "el ente más débil" en la relación contractual y los considera merecedores de protección especial.

IV.

No obstante lo anterior, los recurridos argumentan que tras la firma del contrato de compraventa los peticionarios renunciaron a su reclamación ante DACO y por tanto se allanaron a las prácticas indeseables anteriormente relatadas. Afirman eso en virtud de que la cláusula séptima de la escritura de compraventa expresa, en esencia, que los compradores inspeccionaron la propiedad y la aceptan "como está sin reclamo o reserva de clase alguna." El tribunal apelativo adoptó dicha interpretación.

No hay duda de que la escritura de compraventa constituye la expresión de la voluntad contractual de las partes. Para su interpretación nuestro Código Civil

prescribe un sistema subjetivista, en el cual lo esencial es escudriñar la **verdadera intención** de los contratantes al momento en que se concretó el acuerdo. El criterio rector lo encontramos en el artículo 1233 del Código Civil, 31 L.P.R.A. sec. 3471:

> Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.
>
> **Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá está sobre aquéllas.** (Énfasis nuestro).

Este mandato sobre interpretación contractual debe verse en conjunto con el artículo 1234, según el cual, "para juzgar [la] intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato". 31 L.P.R.A. sec. 3472. Hemos resuelto que también deberán tomarse en cuenta los actos **anteriores** a la contratación, así como **todas aquellas circunstancias** que puedan indicar la voluntad de las partes. Véanse, entre otros, <u>García López v. Méndez García</u>, 102 D.P.R. 383 (1983); <u>Cooperativa La Sagrada Familia v. Castillo</u>, 107 D.P.R. 405, (1978) y <u>Merle v. West Bend Co</u>., 97 D.P.R. 403 (1969)[3]

---

[3]    En <u>Merle v. West Bend Co</u>, supra, pág. 409, explicamos que: "La intención de las partes es el criterio fundamental dispuesto en el Código Civil para fijar el alcance de las obligaciones contractuales. Es tan fundamental este criterio… que el Código proclama su supremacía al disponer que la intención evidente de las partes prevalecerá sobre las palabras, aún cuando éstas parecieren contrarias a ellas".

En lo que al presente caso se refiere, también resulta pertinente la doctrina sobre interpretación de los contratos llamados "de adhesión". Estos son aquellos contratos en cuya redacción no interviene una de las partes y en los que el desequilibrio de poder entre las partes impide un verdadero proceso previo de negociación. Véase IV, 2 José Ramón Vélez Torres, Curso de Derecho civil, Derecho de contratos 7 (1990). Según explicamos en Zequeira v. CRUV, 83 D.P.R. 878, (1961), "el contrato de adhesión presenta el fenómeno de una reducción al mínimo de la bilateralidad contractual". Tratándose de una categoría de contrato "que no consiente la deliberación previa, y, por tanto, es rígidamente uniforme,"[4] la realidad del consumidor queda ceñida a decidir entre aceptar en su totalidad el esquema unilateralmente estructurado por el predisponente, o retirarse del negocio.

El contrato de adhesión es característico de situaciones de contratación en masa. Por lo general, el desarrollador o empresario aprovecha la oportunidad de predisponer el contenido del contrato, para incorporar cláusulas que lo exoneran de responsabilidad o limitan las consecuencias de ésta. El uso abusivo de estas cláusulas limitativas de responsabilidad en la práctica de los negocios ha forzado a los tribunales a recurrir a los

---

[4]    Rubén A. Stiglitz y Gabriel A. Stiglitz, Contratos por adhesión, cláusulas abusivas y protección al consumidor, Ediciones Delsalma, Buenos Aires (1985), pág. 51.

principios generales del derecho para restringir su eficacia. M. García Amigo, Cláusulas limitativas de la responsabilidad contractual, Biblioteca Tecnos de Estudios Jurídicos, Madrid (1965), pág. 157. Adquieren vigencia interpretativa entonces el principio de la buena fe, los principios de conmutatividad del comercio jurídico e interpretaciones a partir del interés colectivo. Luis Díez Picazo y Ponce de León, Fundamentos del Derecho civil patrimonial, Editorial Tecnos, Madrid (1979) pág. 224. Desde esta perspectiva, cuando se trate de negocios imbuidos de interés público, como sucede en el presente caso, "[l]a moderación de los abusos que pueden cometerse en la contratación por adhesión ha de llevarse a cabo por vía jurisprudencial...". Id.

Ante esas circunstancias, la doctrina y nuestra jurisprudencia están contestes en que la interpretación de los contratos de adhesión debe favorecer a la parte más débil económicamente y a la que poco o nada tuvo que ver con su redacción. El propósito, según hemos expresado en reiteradas ocasiones, es "promover, hasta donde ello sea posible, la igualdad jurídica en materia de contratación". Santiago v. Kodak, 129 D.P.R. 763 (1992); Herrera v. First National City Bank, 103 D.P.R. 724, 727 (1975).[5]

---

[5]     Hemos interpretado las cláusulas del contrato de adhesión aplicando el artículo 1240 del Código Civil, 31 L.P.R.A. sec. 3478: "La interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad." Sin embargo, si lo pactado resulta claro y no viola la ley o contraviene el interés público, prevalecerá el contrato, aun cuando el

Es harto conocido que tanto los desarrolladores como la banca comercial son los entes fuertes que controlan la redacción de los contratos de compraventa entre contratistas o desarrolladores y compradores privados. Esa es la razón de ser de la Ley 130. En ese sentido y de acuerdo al claro mandato de dicha ley, resulta esencial que estos contratos sean interpretados en la forma más beneficiosa para la parte más débil, los compradores de viviendas. Resulta particularmente imperativo hacerlo así cuando las acciones anteriores, coetáneas y posteriores de los compradores contradicen la letra de alguna cláusula del acuerdo.

V.

A la luz del derecho antes expuesto, atendamos los hechos particulares de este caso. Advertimos, en primer lugar, que la naturaleza del contrato de compraventa impedía que los compradores pudieran cambiar su contenido o expresar de forma específica su criterio. El contrato de compraventa suscrito entre Sabanera Real y los peticionarios tiene las características típicas de un contrato de adhesión. Está redactado en términos más bien genéricos y estandarizados y no surge de los autos que hubiera discusión previa entre las partes sobre su contenido. Por su parte, la cláusula de aceptación "sin

---

contrato sea de adhesión. Rivera v. Insurance, Co., 103 D.P.R. 91 (1974); Cassanova v. PR-Amer. Ins. Co., 106 D.P.R. 689 (1978).

reservas" también está redactada en términos extremadamente generales. No hay duda de que se trata de la típica cláusula limitativa de responsabilidad que requiere una interpretación restrictiva y cuidadosa. No hay en esta cláusula referencia alguna a la reclamación de los compradores sobre la terminación del techo ni sobre el procedimiento instado ante DACO. Ello confirma que no fue producto de un proceso de deliberación entre las partes.

Los compradores aquí peticionarios expresaron, clara y reiteradamente, su criterio contrario a los cambios en la terminación del plafón de la vivienda que habían opcionado. Mediante carta de 12 de noviembre de 2002 indicaron su descontento con los cambios y el 26 de noviembre reiteraron su reclamo. Finalmente, poco antes de que se firmara la escritura de compraventa, se comunicaron con los abogados de los desarrolladores y les señalaron, sin lugar a equívocos, que no deseaban resolver el contrato de compraventa: "no es nuestro deseo rescindir del contrato de compraventa... por el contrario queremos seguir con el contrato de compra de la unidad".

De esa forma, los peticionarios expresaron su intención contundente de comprar la propiedad y al mismo tiempo continuar con la reclamación que habían presentado ante DACO. Se trata de un curso de acción coherente y con propósitos que no son contradictorios. Los peticionarios querían comprar la propiedad y a la vez exigir que ésta cumpliera con lo acordado y aprobado por ARPE. Resulta

ineludible concluir que los peticionarios no tuvieron nunca la intención de renunciar a su reclamación ante la agencia administrativa.

Los recurridos argumentan que los peticionarios firmaron el contrato con pleno conocimiento de las alteraciones a las especificaciones de la propiedad vendida y que, por ello, aceptaron dichas alteraciones. Aducen que la cláusula general de reserva constituye lo que en inglés se denomina una cláusula "as is" y que ésta, de por sí, los exime de responsabilidad.[6] La interpretación restrictiva que nos impone la doctrina y la jurisprudencia nos lleva a concluir todo lo contrario. No podemos penalizar a los peticionarios porque fueron diligentes y ejercieron el derecho que les otorga la Ley 130 a inspeccionar la propiedad opcionada. Tampoco podemos castigarlos por su diligencia en reclamar sus derechos ante

---

[6] En Estados Unidos la mayoría de los tribunales han resuelto que para que la llamada cláusula "as is" sea válida, debe haberse negociado de forma específica: "Courts should begin with a rebuttable presumption that such clauses were not actually understood or agreed to by the purchasers. This presumption comports more closely with the practical realities experienced by purchasers, who often give little attention to such provisions." Craig W. Dallon, *Theories of Real Estate Broker Liability and the Effect of the "As Is" Clause*, 54 Fla. L. Rev. 395, 445, Julio 2002. Este autor recalca que los tribunales no deben, de ordinario, otorgar validez a las cláusulas de relevo de responsabilidad redactadas en términos generales: "Courts should give careful consideration to the specificity of the clause and be particularly scrutinizing of boiler-plate, one-size-fits-all provisions stating that the purchaser buys the property "as is" or that the purchaser has not relied upon any representations made by seller's agents. Although the generality of a provision need not be fatal to enforcement of a provision, a provision that is specific to the particular facts of a sale is more likely to be the product of deliberation or consideration than the standard, one-size-fits-all provision, included routinely in contracts". Id., pág. 447.

la compañía que desarrolló el proyecto y ante la agencia encargada de reglamentar estos negocios. Lo que esto indica es que los vendedores conocían a plenitud tanto la reclamación de los peticionarios como su intención de continuar con la compra de la vivienda opcionada.

En conclusión, resolvemos que al firmar la escritura de compraventa preparada y redactada por el vendedor, los compradores no renunciaron a su reclamación ante DACO, aunque dicho documento contuviera una cláusula de aceptación sin reservas que no fue negociada por ellos. Por consiguiente, la firma de esa escritura no liberó a los desarrolladores de sus responsabilidades estatutarias y DACO actuó correctamente al ordenarles cumplir con las especificaciones de los planos de ARPE vigentes al momento de la reclamación.

Por los fundamentos antes expuestos se revoca la resolución del Tribunal de Apelaciones y se devuelve el caso a DACO para que continúe con los procedimientos de forma consistente con nuestra decisión.

Se dictará sentencia de conformidad.


                                    Liana Fiol Matta
                                    Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Daniel Suárez Figueroa, Maribel
Velázquez Rosa
        Peticionarios

                                    *Certiorari*

                        CC-2004-118

        v.

Sabanera    Real,    Inc.,    y/o
P.R.D.,       L.P.;       Century
Development Group; Jaime López
        Recurridos

*SENTENCIA*

En San Juan, Puerto Rico, a 6 de mayo de 2008.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la resolución del Tribunal de Apelaciones y se devuelve el caso a DACO para que continúe con los procedimientos de forma consistente con nuestra decisión.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Rodríguez Rodríguez concurre sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo